IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-4711
_____

DOMINGO GUEVARA,

Plaintiff-Appellee,

v.

MARITIME OVERSEAS CORPORATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
(July 26, 1995)

Before POLITZ, Chief Judge, GOLDBERG,[*] KING, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE,
EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, and PARKER, Circuit
Judges.

KING, Circuit Judge:

We reheard this case en banc to reconsider our 1984 decision
in Holmes v. J. Ray McDermott & Co., 734 F.2d 1110 (5th Cir. 1984),
that an award of punitive damages under the general maritime law
may be made when an employer willfully and callously refuses to pay
maintenance or cure to an injured seaman. Developments in the law

_____

[*] Judge Irving L. Goldberg was a member of the panel that
initially decided this case and he heard oral argument before the
en banc court. Judge Goldberg died on February 11, 1995, before
this decision was rendered.

since 1984 have caused us to reevaluate the basis for such a punitive award and to conclude that <u>Holmes</u> should be overruled.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts and procedural history of this case are set forth in the panel opinion, <u>Guevara v. Maritime Overseas Corp.</u>, 34 F.3d 1279 (5th Cir.), <u>reh'g en banc granted</u>, 34 F.3d 1290 (5th Cir. 1994), but we summarize them here for the reader's convenience.

Domingo Guevara was injured on May 29, 1990 while serving as a crewmember on the vessel *Overseas Philadelphia*.  The vessel was owned and operated by Guevara's employer, Maritime Overseas Corporation ("Maritime").  The crew was preparing the ship to sail from Freeport, Texas, and Guevara was helping to secure the gangway.  Because of the gangway's size, the ship's crane was used to lift it, and the task was being performed in the midst of considerable wind and rain.

Guevara was standing on a catwalk on the vessel pursuant to the orders of his superior, the vessel's bosun, who was operating the crane.  As the gangway was lifted, it swayed in Guevara's direction, and the bosun ordered Guevara to move away from where he was standing.  When Guevara tried to move, however, he momentarily caught the tread of his boot in the catwalk grating.  After freeing himself, Guevara jumped from the catwalk to the deck below to avoid being hit by the gangway.

Unfortunately, Guevara injured his knee while falling to the deck.  He promptly reported his injury to the third mate and he was given assistance.  Despite his injury, Guevara continued to work on

2

the vessel for a period of four months, apparently to qualify for union benefits. Upon the vessel's return to port, Guevara saw a doctor who diagnosed him as having a torn medial meniscus and a torn anterior cruciate ligament. Although Guevara was initially reluctant to undergo surgery, his knee was operated on in February of 1991. Beginning on February 5, 1991, Guevara made a number of formal demands on Maritime for maintenance and cure. Maritime, however, made no payment until June 24, 1991 at the earliest. Despite subsequent demands, Guevara did not receive his second and final payment until December 29, 1991.

Guevara brought a negligence claim under the Jones Act and an unseaworthiness claim under the general maritime law against Maritime. Guevara also sought punitive damages for Maritime's failure to pay maintenance on a timely basis. The jury returned a verdict for Guevara, finding Maritime negligent, the *Overseas Philadelphia* unseaworthy, and Guevara not negligent. Further, the jury awarded Guevara $131,000 in compensatory damages for his injury and $60,000 in punitive damages for Maritime's arbitrary and capricious failure to pay maintenance.[1] Maritime now appeals.

---

[1] The $60,000 punitive award was based upon the jury's affirmative response to the question "Do you find that the defendant, Maritime Overseas Corporation, arbitrarily and capriciously failed to provide maintenance to the plaintiff, Dom[i]ngo Guevara on a timely basis?" The jury was then asked, "[W]hat sum of money do you find from a preponderance of the evidence should be awarded to the plaintiff as punitive damages, as that term has been defined in this charge?" The jury was not asked to award attorney's fees or compensatory damages on account of Maritime's failure to pay maintenance.

In this opinion, we only address the question of whether punitive damages are still available in maintenance and cure cases. As a consequence, the portions of the panel opinion addressing the jury's finding of negligence (Part IIA), see Guevara, 34 F.3d at 1281-82, and the jury's finding of Maritime's arbitrary and capricious behavior (Part IIB), see id. at 1282-83, are reinstated.

## II.  ANALYSIS AND DISCUSSION

### A.  The Doctrine of Maintenance and Cure

When a seaman becomes ill or injured while in the service of his ship, the shipowner must pay him maintenance and cure regardless of whether the shipowner was at fault or whether the ship was unseaworthy. See Morales v. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir. 1987). "Maintenance" is the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the ship. "Cure" is the right to necessary medical services. This duty to pay maintenance and cure is of ancient vintage, and its origin is customarily traced back to the medieval sea codes. See The Osceola, 189 U.S. 158, 169 (1903); see generally Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 6-6, at 281 (2d ed. 1975); Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-28, at 348 (2d ed. 1994). Only "seamen" can assert the right to maintenance and cure, but the legal test for seaman status in maintenance and cure actions is the same as the inquiry for standing under the Jones Act. See, e.g., Hall v. Diamond M Co., 732 F.2d 1246, 1248 (5th Cir. 1984) ("The standard for determining seaman status for the purposes of

4

maintenance and cure is the same as that established for determining status under the Jones Act.").

In the United States, the doctrine of maintenance and cure appears to have been recognized by Justice Story in two cases which he decided while riding on circuit.  See Harden v. Gordon, 11 F. Cas. 480 (C.C.D. Me. 1823) (No. 6,047); Reed v. Canfield, 20 F. Cas. 426 (C.C.D. Mass. 1842) (No. 11,641).  These cases generally explain the seaman's right to maintenance and cure partly on humanitarian grounds and partly on economic grounds.  As Gilmore and Black write:

> The doctrine not only protected the childlike and improvident seaman (who is usually "poor and friendless" and apt to acquire "habits of gross indulgence, carelessness and improvidence"), but served "the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation."  Even the shipowners derived an ultimate benefit from being made to assume these charges, since, as Story shrewdly pointed out, seamen were thereby encouraged "to engage in perilous voyages with more promptitude, and at lower wages."

Gilmore & Black, supra, § 6-6, at 281 (quoting Harden v. Gordon, 11 F. Cas. 480 (C.C.D. Me. 1823) (Case No. 6,047)) (footnote omitted). This obligation to provide maintenance and cure "embraces not only the obligation to pay a subsistence allowance and to reimburse the seaman for medical expenses he incurs; the employer must take all reasonable steps to insure that the seaman who is injured or ill receives proper care and treatment."  Schoenbaum, supra, § 6-28, at 348; see also Morales, 829 F.2d at 1358.

### B. Legal Developments and their Effect on Holmes v. J. Ray McDermott

5

Until 1984, we had never upheld an award of punitive damages for the willful nonpayment of maintenance and cure. In our 1984 Holmes opinion, however, we did uphold such a punitive award, and we supported the award with the following analysis:

> In Vaughan v. Atkinson, 369 U.S. 527 (1962), the Supreme Court held that an employer's willful and arbitrary refusal to pay maintenance and cure gives rise to a claim for damages in the form of attorneys' fees in addition to the claim for general damages. Subsequent decisions have established that, in addition to such attorneys' fees, punitive damages for such refusal are available under the general maritime law. See Complaint of Merry Shipping, Inc., 650 F.2d 622, 625 (5th Cir. 1981) (collecting cases); see also Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1st Cir. 1973).

734 F.2d at 1118 (citations omitted). Thus, at the time of our Holmes decision, we relied upon three cases -- the Supreme Court's Vaughan, this court's Merry Shipping, and the First Circuit's Pocahontas -- and there was not a great deal of additional guidance to be found. Judge Garwood's well-considered concurrence to the panel opinion, see Guevara, 34 F.3d at 1284-90 (Garwood, J., concurring), together with significant developments in the law of admiralty and elsewhere, have caused us to rethink our position. We begin, therefore, by reexamining the precedents that form the foundation of our Holmes opinion, and in the end, we conclude that Holmes's approval of punitive damages is no longer justifiable in cases of willful nonpayment of maintenance and cure.

### 1. Vaughan v. Atkinson

In Holmes, we cited Vaughan v. Atkinson, 369 U.S. 527 (1962), only for the proposition that a willful and arbitrary failure to pay maintenance and cure gave rise to a claim for attorney's fees

6

as well as general damages.  See 734 F.2d at 1118.  We did **not** cite Vaughan as an example of the Supreme Court's approval of punitive damage awards in the maintenance and cure context; indeed, we explicitly noted that it was "subsequent decisions" that made punitive damages available.  See id.  Nevertheless, it is possible that Vaughan, while only upholding an award of attorney's fees, announced a principle broader than its result.  Thus, we now attempt to determine how broad this principle is.

Vaughan, a brief opinion by Justice Douglas, is a difficult decision -- not because of its holding, but because of the rationale for its holding.  It is clear that the majority in Vaughan upheld an award of attorney's fees to a seaman where his employer had deliberately withheld payment of maintenance and cure. See Vaughan, 369 U.S. at 529-31.  The difficulty, however, stems from the theory on which the majority awarded the attorney's fees.

On the one hand, the adjectives used by the majority to describe the employer's behavior -- "callous," "recalcitran[t]," "willful and persistent" -- imply that the award of attorney's fees was meant to be a punitive sanction.  See id. at 530-31.  On the other hand, the majority cited Cortes v. Baltimore Insular Line, 287 U.S. 367, 371 (1932), for the proposition that an employer's failure to pay maintenance and cure may entitle a seaman to the recovery of "necessary expenses."  The Court further stated that the seaman "was forced to hire a lawyer to get what was plainly owed him," and the Court noted that "[i]t is difficult to imagine a clearer case of damages suffered for failure to pay maintenance

7

than this one." Vaughan, 369 U.S. at 531. This terminology clearly suggests that the attorney's fees were meant as a compensatory award for out-of-pocket expenses, as punitive damages are not "owed" as "expenses" and are not designed to remedy "damages suffered." Indeed, the language of the dissent implies that the majority's rationale for the attorney's fees award was compensatory, while *the dissent* believed that the rationale should be punitive:

> Cortes [, cited by the majority, ] dealt with compensatory damages for a physical injury, and the opinion in that case contains nothing to indicate a departure from the well-established rule that counsel fees may not be recovered as compensatory damages.
> . . .
> However, if the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman, the latter would be entitled to exemplary damages in accord with traditional concepts of the law of damages. While the amount so awarded would be in the discretion of the fact finder, and would not necessarily be measured by the amount of counsel fees, indirect compensation for such expenditures might thus be made.

<u>Id.</u> at 540 (Stewart, J., dissenting) (citation omitted).[2]  Because of this difficulty stemming from the <u>Vaughan</u> rationale, it is not surprising that commentators are divided as to whether the attorney's fees award was intended to be compensatory or punitive in nature.  <u>Compare</u> 6 James Wm. Moore, <u>Moore's Federal Practice</u> ¶ 54.78[3], at 54-503 to -504 & n.29 (2d ed. 1994) ("The [<u>Vaughan</u>] court found that when a seaman's employer refused to pay the seaman maintenance that `was plainly owed under laws that are centuries old,' thus forcing the seaman to retain counsel and sue for it, the expenses of the suit could rightly be treated as part of the compensatory damage.") <u>with</u> Gilmore & Black, <u>supra</u>, § 6-13, at 313 (noting that <u>Vaughan</u> "awarded what were essentially punitive damages under the name of counsel fees").[3]

---

[2]     Indeed, on remand from the Supreme Court, the district court in <u>Vaughan</u> stated the following:

> As this court interprets the language of the Supreme Court, the intent and purpose of the same is that the trial court should make the seaman "whole", i.e., he should not be required to pay money out of his pocket to collect maintenance lawfully due to him.  To accomplish this fact, the respondents are required to pay, by way of damages, a reasonable attorney's fee to libellant's proctor for prosecuting the proceedings made necessary to collect the seaman's maintenance claim.
> . . .
> We do not read the majority opinion of the Supreme Court as suggesting that punitive damages are in order.

<u>Vaughan v. Atkinson</u>, 206 F. Supp. 575, 576 (E.D. Va. 1962).

[3]     Surprisingly, Guevara does not argue that <u>Vaughan</u> supports the award of punitive damages in maintenance and cure cases.  According to Guevara, the punitive damages issue was not before the Court in <u>Vaughan</u> -- "[t]he seaman had not pled for punitive damages and the Court did not award punitive damages."  Instead, as Guevara contends, "[t]he Court awarded exactly what

9

Fortunately, in deciphering <u>Vaughan</u>, we are aided by seven subsequent Supreme Court cases that have cited the opinion.[4] In all seven cases, the Court has treated <u>Vaughan</u> as supporting an exception to the "American Rule" that litigants generally must bear their own costs. In the 1967 <u>Maier Brewing</u> case, the Court read <u>Vaughan</u> as establishing a compensatory basis for fee-shifting:

> Limited exceptions to the American rule . . . have been sanctioned by this Court when overriding considerations of justice seemed to compel such a result. In appropriate circumstances, we have held, an admiralty plaintiff may be awarded counsel fees ***as an item of compensatory damages*** (not as a separate cost to be taxed). <u>Vaughan v. Atkinson</u>, 369 U.S. 527 (1962).

the Plaintiff pled for, attorney fees incurred as a necessary expense in having to go to court . . . ." <u>See also</u> <u>Hines v. J.A. LaPorte, Inc.</u>, 820 F.2d 1187, 1189 (11th Cir. 1987) ("<u>Vaughan</u> is not dispositive because in that case only a claim for attorney's fees was asserted, not separate claims for both fees and punitive damages.").

Similarly, Maritime argues that the language used in <u>Vaughan</u> "clearly shows that the Supreme Court awarded compensatory damages, not punitive damages," but, contrary to Guevara's position, Maritime also contends that the issue of punitive damages ***was*** before the Court in <u>Vaughan</u> and was clearly rejected by the majority. In support, Maritime cites the language of the dissent and states that "[t]he dissent's discussion of exemplary damages shows that the issue of punitive damages was before the Court. The clear majority, however, rejected such [a theory] . . . ." As mentioned, even though Guevara does not explicitly rely on <u>Vaughan</u> for his overall contention that punitive damages are available, Guevara does rely on <u>Holmes</u>. Because the instant case provides us with an opportunity to reexamine our position in <u>Holmes</u>, we find it prudent to determine whether <u>Vaughan</u> announced a broader principle in support of punitive awards in maintenance and cure cases.

[4] <u>See</u> <u>Summit Valley Indus., Inc. v. Local 112</u>, 456 U.S. 717 (1982); <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752 (1980); <u>Runyon v. McCrary</u>, 427 U.S. 160 (1976); <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240 (1975); <u>F.D. Rich Co. v. United States</u>, 417 U.S. 116 (1974); <u>Hall v. Cole</u>, 412 U.S. 1 (1973); <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714 (1967).

10

386 U.S. at 718 (emphasis added) (footnote omitted).  Since <u>Maier Brewing</u>, however, <u>Vaughan</u> has come to stand for the proposition that attorney's fees can be awarded to a prevailing party when his opponent has engaged in bad-faith conduct during litigation.  <u>See Shimman v. International Union of Operating Eng'rs</u>, 744 F.2d 1226, 1229-30 (6th Cir. 1984) (tracing the citation history of <u>Vaughan</u>), <u>cert. denied</u>, 469 U.S. 1215 (1985).  In fact, <u>Vaughan</u> is often cited as a foundational case for this "bad-faith" exception to the American Rule.  <u>See</u> <u>Summit Valley</u>, 456 U.S. at 721; <u>Hall</u>, 412 U.S. at 5; <u>Shimman</u>, 744 F.2d at 1230.

Our knowledge that <u>Vaughan</u> is later cited as a foundation of the bad-faith exception to the American Rule, however, does not tell us whether this type of fee-shifting is compensatory or punitive in nature.  In <u>Hall v. Cole</u>, the Court made the following observation:

> Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  In this class of cases, ***the underlying rationale of `fee-shifting' is, of course, punitive***, and the essential element in triggering the award of fees is therefore the existence of `bad faith' on the part of the unsuccessful litigant.

412 U.S. at 5 (emphasis added) (citations omitted) (internal quotation omitted).  <u>Hall</u>'s reasoning was reaffirmed in the recent case of <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32 (1991).  Quoting <u>Hall</u>, the <u>Chambers</u> Court noted that "in the case of the bad-faith exception to the American Rule, `the underlying rationale of `fee-shifting' is, of course, punitive.'"  <u>Id.</u> at 53.

11

A careful reading of Chambers, however, belies the view that awards made under the bad-faith exception to the American Rule are "punitive damages" in the sense that they punish the conduct giving rise to a plaintiff's claim. The Chambers Court distinguished between fees awarded pursuant to the bad-faith exception, which are based upon a federal court's inherent power to sanction parties for their litigation behavior, see id. at 47, and other "fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees." Id. at 52. In other words, as the Court explained, "the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves *during the litigation*." Id. at 53 (emphasis added).

While the Chambers majority expressed no opinion on the question of whether a federal court has the inherent power to impose sanctions for conduct giving rise to an underlying claim, rather than for bad-faith conduct during the litigation process, see id. at 54 n.16, four justices were firmly of the view that bad-faith fee-shifting may not be used to sanction pre-litigation conduct. Justice Scalia noted that the American Rule "prevents a court (without statutory authorization) from engaging in what might be termed *substantive* fee shifting, that is, fee shifting as part of the merits award. It does not in principle bar fee shifting as a sanction for procedural abuse." Id. at 59 (Scalia, J., dissenting). Similarly, Justice Kennedy, joined by Chief Justice Rehnquist and Justice Souter, made the following observation:

12

> [I]t is impermissible to allow a District Court acting
> pursuant to its inherent authority to sanction such
> prelitigation primary conduct.  A court's inherent
> authority extends only to remedy abuses of the judicial
> process.  By contrast, awarding damages for a violation
> of a legal norm, [such as] the binding obligation of a
> legal contract, is a matter of substantive law . . . .
> [The] bad-faith exception permits fee shifting as a
> sanction to the extent necessary to protect the judicial
> process. . . .  When a federal court, through invocation
> of its inherent powers, sanctions a party for bad-faith
> prelitigation conduct, it goes well beyond the exception
> to the American Rule . . . .

Id. at 74 (Kennedy, J., dissenting).

The upshot of this extended discussion is that the bad-faith exception to the American rule, of which the Vaughan award is cited as an example, is not a punitive award in the "tort" sense of punishing the underlying conduct that gives rise to a plaintiff's claim.  Tort-like punitive damages are awarded on the basis of the merits of a case, while bad-faith fee-shifting punishes abuses of the litigation process.

In the end, we need not definitely resolve whether Vaughan awarded attorney's fees as an item of compensatory or punitive damages.  The award clearly has a "make-whole" compensatory aspect, see Maier Brewing, 386 U.S. at 718, and, based upon the facts of Vaughan, the award also has a punitive aspect to the extent that it punished an abuse of the litigation process.  See, e.g., Chambers, 501 U.S. at 52-53; Shimman, 744 F.2d at 1230-32.  According to the case law, however, the punitive aspect of the Vaughan award **is** the bad-faith exception to the American Rule, and that exception is limited to a recovery of attorney's fees.  The Vaughan award was clearly **not** a punitive damages award in the tort sense of punishing

13

the underlying conduct that gave rise to the litigation, and the developing case law does not support such a position.

Simply put, all we can confidently say about Vaughan is that it entitles an injured seaman to recover attorney's fees -- perhaps as part of compensatory damages -- when his employer willfully fails to pay maintenance and cure. We cannot definitively conclude, however, that Vaughan establishes any broader principle to support Holmes's rule that tort-like punitive damages, not limited to attorney's fees, are available in cases of willful nonpayment of maintenance and cure.

## 2. Dyer v. Merry Shipping Co.

In Dyer v. Merry Shipping Co., 650 F.2d 622, 623 (5th Cir. Unit B July 1981), the widow of a deceased seaman brought a wrongful death cause of action based upon the Jones Act and the unseaworthiness doctrine of the general maritime law. The primary issue on appeal was whether "punitive damages [could] be recovered in a seaman's action brought under either general maritime law or the Jones Act, or both." Id. We did not answer the Jones Act question, noting that "[t]he district court may well be correct that punitive damages may not be recovered in this Circuit under the Jones Act, although we need not decide the issue at this time." Id. at 626. As to the general maritime action, however, we concluded that "in this Circuit punitive damages may be recovered under general maritime law upon a showing of willful and wanton misconduct by the shipowner." Id. Consequently, we reversed the

14

district court's dismissal of the plaintiff's claim for punitive damages.  See id. at 626-27.[5]

Because Merry Shipping was an earlier panel opinion, we were bound by its holding in Holmes.  Indeed, even though Merry Shipping dealt with punitive damages in an unseaworthiness context, the analysis, which we will soon discuss, was wholly applicable to maintenance and cure cases as well, and the court concluded with a broader declaration: "in this Circuit punitive damages may be recovered *under general maritime law* . . . ." (emphasis added).  The law, of course, is constantly developing, and with the 1990 decision of the Supreme Court in Miles v. Apex Marine Corp., 498 U.S. 19 (1990), the analysis that we relied upon in Merry Shipping has been significantly undermined.

In reaching our holding in Merry Shipping -- that punitive damages are available in a wrongful death action brought by the representative of a seaman under the unseaworthiness doctrine of the general maritime law -- we relied upon a key proposition: "It does not follow . . . that if punitive damages are not allowed under the Jones Act, they should also not be allowed under general maritime law." Merry Shipping, 650 F.2d at 626.  To understand why we now view this proposition as problematic, an examination of the Miles analysis is necessary.

_____

[5]    The district court dismissed Dyer's claim for punitive damages on the ground that as a matter of law, such damages were not recoverable under either the Jones Act or the general maritime law.  The court expressly declined to determine whether the facts of the case could give rise to punitive damages, if such damages were available.  See Merry Shipping, 650 F.2d at 623.

15

### a.  <u>Miles v. Apex Marine Corp.</u>

In <u>Miles</u>, the parents of a seaman killed by a fellow crew member ultimately recovered under the Jones Act for the negligence of the ship's operators, charterer, and owner, as well as under the general maritime law on the basis that the ship was unseaworthy as a matter of law.  <u>See</u> 498 U.S. at 21-22.  The unseaworthiness ruling presented two questions concerning the scope of damages under the general maritime law:  1) whether a nondependent parent could recover for loss of society in a general maritime wrongful death action, and 2) whether the general maritime law permits a survival action for the decedent's lost future earnings.  <u>See id.</u> at 22-23.  A unanimous Court held that although the wrongful death of a seaman is actionable under the general maritime law, damages recoverable in such actions do not include loss of society.  <u>See id.</u> at 33.  The Court also held that a general maritime survival action cannot include recovery for the decedent's lost future earnings.  <u>See id.</u> at 36.

The <u>Miles</u> Court began by thoroughly describing <u>Moragne v. States Marine Lines</u>, 398 U.S. 375 (1970), in which the Court overruled its prior decision in <u>The Harrisburg</u>, 119 U.S. 199 (1886), to create a general maritime wrongful death cause of action applicable in all waters.  The <u>Moragne</u> Court's decision was driven by two complementary rationales:  consistency of the general maritime law with the policy implemented in the Jones Act and in the Death on the High Seas Act ("DOHSA") favoring wrongful death recovery, and "the constitutionally based principle that federal

16

admiralty law should be `a system of law coextensive with, and operating uniformly in, the whole country.'" Moragne, 398 U.S. at 402 (quoting The Lottawanna, 88 U.S. (21 Wall.) 558, 575 (1874)).

The Miles Court noted that Moragne "exemplifies the fundamental principles that guide our decision in this case":

> [i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance. We may supplement these statutory remedies where doing so would achieve the uniform vindication of such policies consistent with our constitutional mandate, but we must also keep strictly within the limits imposed by Congress. **Congress retains superior authority in these matters, and an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation. These statutes both direct and delimit our actions.**

498 U.S. at 27 (emphasis added). The Court noted that Moragne did not set forth the scope of recoverable damages under the maritime wrongful death action; thus, the Court sought guidance from comparable federal statutes.

Starting with DOHSA, the Court observed that the statute, by its explicit terms, prohibited the recovery of nonpecuniary damages. Miles, 498 U.S. at 31; see Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 622-24 (1978). Responding to the contention that admiralty courts have traditionally undertaken to supplement maritime statutes, the Miles Court stated:

> Congress has spoken directly to the question of recoverable damages on the high seas, and "when it does speak directly to a question, the courts are not free to `supplement' Congress' answer so thoroughly that the Act becomes meaningless." Moragne involved gap filling in an area left open by statute; supplementation was entirely appropriate. But in an "area covered by the statute, it would be no more appropriate to prescribe a different measure of damages than to prescribe a different statute of limitations, or a different class of beneficiaries."

17

Id. at 31 (quoting Higginbotham, 436 U.S. at 625) (citation omitted).

Turning to the Jones Act, the Court observed that a well-established pecuniary limitation on damages existed under the Federal Employers' Liability Act ("FELA") at the time of the enactment of the Jones Act.[6]  The Court noted that by "incorporating FELA unaltered into the Jones Act, Congress must have intended to incorporate the pecuniary limitation on damages as well."  Id. at 32.  Even though a general maritime unseaworthiness action, rather than a Jones Act action, was at issue in Miles, the Court stated that "[i]t would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence."  Id. at 32-33.  The Court concluded that "there is no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman," and the Court noted that "[t]oday we restore a uniform rule applicable to all actions *for the wrongful death of a seaman*, whether under DOHSA, the Jones Act, or general maritime law."  Id. at 33 (emphasis added).

---

[6]    The Miles Court explained that this pecuniary limitation on damages stemmed from the Court's decision in Michigan Central Railroad Co. v. Vreeland, 227 U.S. 59 (1913). In Vreeland, the Court explained that the language of the FELA wrongful death provision was essentially identical to that of Lord Campbell's Act -- the first wrongful death statute.  Lord Campbell's Act and the many state statutes that followed it had consistently been interpreted to provide recovery only for pecuniary loss; thus, the Vreeland Court construed FELA in the same manner.  See Vreeland, 227 U.S. at 69-71.

18

The Court then addressed the second question: "whether, in a general maritime action surviving the death of a seaman, the estate can recover decedent's lost future earnings." Id. The Court noted that recognizing a right to recover lost future income in a survival action would be a "distinctly minority view," but the Court stated that "[t]his fact alone would not necessarily deter us, if recovery of lost future income were more consistent with the general principles of maritime tort law." Id. at 35. The Court cited "strong policy arguments for allowing such recovery," including economic incentives and solicitude to seamen, id. at 35-36, but the Court's decision was driven by the analytical framework that it had previously used:

> We sail in occupied waters. Maritime tort law is now dominated by federal statute, and we are not free to expand remedies at will simply because it might work to the benefit of seamen and those dependent upon them. Congress has placed limits on recovery in survival actions that we cannot exceed. Because this case involves the death of a seaman, we must look to the Jones Act.
>
> The Jones Act/FELA survival provision limits recovery to losses suffered during the decedent's lifetime. This was the established rule under FELA when Congress passed the Jones Act, incorporating FELA, and it is the rule under the Jones Act. Congress has limited the survival right for seaman's injuries resulting from negligence. As with loss of society in wrongful death actions, this forecloses more expansive remedies in a general maritime action founded on strict liability. . . . Because [the] estate cannot recover for his lost future income under the Jones Act, it cannot do so under general maritime law.

Id. at 36 (citations omitted).

The analytical framework of Miles governs our approach to deciding damages issues in general maritime actions. In order to

19

decide whether (and how) Miles applies to a case, a court must first evaluate *the factual setting of the case* and determine what statutory remedial measures, if any, apply in that context. *If the situation is covered by a statute like the Jones Act or DOHSA*, and the statute informs and limits the available damages, the statute directs and delimits the recovery available under the general maritime law as well. The general maritime law will not expand the available damages when Congress has spoken to the relief it deems appropriate or inappropriate. See Anderson v. Texaco, Inc., 797 F. Supp. 531, 536 (E.D. La. 1992).

The factual setting in Miles nicely exemplifies this approach. Miles involved a seaman in a factual setting of wrongful death, and the wrongful death of a seaman is covered by the Jones Act. Thus, even though the plaintiff also sued for wrongful death under the general maritime law, *the factual setting was still the wrongful death of a seaman*, and Miles compels damages uniformity with the statutory schemes that cover the same factual circumstances. Cf. Miles, 498 U.S. at 36 ("Congress has placed limits on recovery in survival actions that we cannot exceed. *Because this case involves the death of a seaman, we must look to the Jones Act*." (emphasis added)). The Jones Act prohibits non-pecuniary recovery; thus, the Miles Court found that the general maritime unseaworthiness action for the wrongful death of a seaman must have a similar prohibition against non-pecuniary awards. Although the Miles Court did not

mention punitive damages, they are also rightfully classified as non-pecuniary.[7]

Taking the analysis one step further, it should be clear that actions under the general maritime law for **personal injury** are also subject to the <u>Miles</u> uniformity principle, as non-fatal actions for personal injury to a seaman are covered by statute -- i.e., the Jones Act.[8] Thus, many courts have extended <u>Miles</u>'s logic to prohibit the recovery of certain damages in personal injury factual settings that are covered by statute, even when these personal

---

[7]    See <u>Wahlstrom v. Kawasaki Heavy Indus., Ltd.</u>, 4 F.3d 1084, 1094 (2d Cir. 1993) ("We are in general agreement with the view that plaintiffs who are not allowed by general maritime law to seek nonpecuniary damages for loss of society should also be barred from seeking nonpecuniary punitive damages."), <u>cert. denied</u>, 114 S. Ct. 1060 (1994); <u>Bergen v. F/V St. Patrick</u>, 816 F.2d 1345, 1347 (9th Cir. 1987) ("Punitive damages are non-pecuniary damages unavailable under the Jones Act."); <u>Kopczynski v. The Jacqueline</u>, 742 F.2d 555, 561 (9th Cir. 1984) ("Punitive damages are nonpecuniary."), <u>cert. denied</u>, 471 U.S. 1136 (1985); <u>Merry Shipping</u>, 650 F.2d at 626 (noting that its previous holding that only pecuniary damages are recoverable under the Jones Act casts doubt upon the availability of punitive damages under the Act); <u>Kozar v. Chesapeake and Ohio Ry. Co.</u>, 449 F.2d 1238, 1240-43 (6th Cir. 1971); <u>Anderson</u>, 797 F. Supp. at 534 ("[T]he post-<u>Miles</u> district court cases, in this district and in others, speak with one voice in concluding that punitive damages are nonpecuniary and, therefore, are not recoverable under <u>Miles</u>'s interpretation of the Jones Act.") (collecting cases); <u>Penrod Drilling Corp. v. Williams</u>, 868 S.W.2d 294, 296-97 (Tex. 1993).

[8]    The Jones Act provides in the following relevant part:

> Any seaman who shall suffer **personal injury** in the course of his employment may, at his election, maintain an action for damages at law . . . and in case of death of any seaman **as a result of any such personal injury** the personal representative of such seaman may maintain an action for damages at law . . . .

46 U.S.C. § 688(a).

21

injury claims are brought under the general maritime law.⁹  See,

⁹       Although the Miles Court discussed Vreeland's pecuniary limitation on FELA and Congress's incorporation of FELA into the Jones Act, it is important to remember that Vreeland was discussing the FELA wrongful death provision.  See Miles, 498 U.S. at 32; Vreeland, 227 U.S. at 69-71; supra note 7.  Thus, the Jones Act pecuniary limitation discussed in Miles -- a limitation stemming from a FELA limitation on *wrongful death* claims -- is arguably not applicable to *non-fatal personal injury* claims under the Jones Act.  See Horsley, 15 F.3d at 202 & n.2 ("[A]s concerns the Jones Act, Vreeland is inapposite to the availability of damages for *non*pecuniary loss in cases involving *non*fatal injuries. . . .  [T]he evidence directly adduced by the Miles Court is not directly probative beyond the discrete confines of wrongful death actions.").

This distinction will not affect a claim for punitive damages, however, because "[i]t has been the unanimous judgment of the courts *since before the enactment of the Jones Act* that punitive damages are not recoverable under the Federal Employers' Liability Act."  Miller v. American President Lines, Ltd., 989 F.2d 1450, 1457 (6th Cir.) (citing Kozar, 449 F.2d at 1240-43) (emphasis added), cert. denied, 114 S. Ct. 304 (1993); see also Horsley, 15 F.3d at 203 (quoting Miller in a personal injury case and denying recovery for punitive damages in unseaworthiness actions); Kopczynski, 742 F.2d at 560 ("Prior to enactment of the Jones Act in 1920, it had been established that only compensatory damages were available in FELA actions.").

The Sixth Circuit's Kozar opinion quoted from a number of Supreme Court cases, including St. Louis, Iron Mountain & Southern Railway Co. v. Craft, 237 U.S. 648 (1915).  In Craft, the Court indicated that an *injured* employee's right under the FELA was to recover *compensatory* damages.  See Craft, 237 U.S. at 656 (noting that the FELA "invests the injured employe[e] with a right to such damages as will *compensate* him for his personal loss and suffering" (emphasis added)); id. at 658 (observing that the FELA allowed "the right existing in the injured person at his death" to survive to the injured's personal representative, and then stating that the personal representative could therefore recover "such damages as will be reasonably *compensatory* for the loss and suffering of the injured person while he lived" (emphasis added)); see also Vreeland, 227 U.S. at 65 ("If he [the injured employee] had survived he might have recovered such damages as would have *compensated* him for his expense, loss of time, suffering and diminished earning power." (emphasis added)).  Thus, when the Jones Act, incorporating FELA, was enacted in 1920, see Miles, 498 U.S. at 32, injured employees did not have a right to recover punitive damages under the FELA.  As a consequence, the same punitive damages bar was incorporated into

22

_e.g._, Murray v. Anthony J. Bertucci Constr. Co., 958 F.2d 127, 131-32 (5th Cir.) (applying the principles of Miles to preclude an injured seaman's spouse from recovering loss of society damages under the general maritime law), cert. denied, 113 S. Ct. 190 (1992); Michel v. Total Transp., Inc., 957 F.2d 186, 191 (5th Cir. 1992) (applying Miles to a personal injury claim by a seaman and holding that "damages recoverable in general maritime causes of action for personal injury of a Jones Act seaman do not include loss of consortium"); Anderson, 797 F. Supp. at 534, 536 (noting in a personal injury action of seamen that their general maritime claims "encompass[ed] the same factual events and the same injuries as their Jones Act claims," and concluding that "[t]he application of Miles here compels the dismissal of the plaintiffs' unseaworthiness and general maritime negligence punitive damages claims").

After Miles, it is clear that Merry Shipping has been effectively overruled. Its holding -- that punitive damages are available in a wrongful death action brought by the representative of a seaman under the unseaworthiness doctrine of the general maritime law -- is no longer good law in light of the Miles uniformity principle because, in the factual scenario of Merry Shipping, the Jones Act damages limitations control.[10]

---

the Jones Act. See Pacific S.S. Co. v. Peterson, 278 U.S. 130, 136-39 (1928) ("[T]he right under the new [Jones Act] rule [allows a seaman] to recover **compensatory damages for injuries** caused by negligence" (emphasis added)).

[10] It is interesting to note that in Merry Shipping, an unseaworthiness case, we looked to the availability of punitive

### 3.  Robinson v. Pocahontas, Inc.

We turn to the last of our precedents that formed the foundation of our Holmes decision -- Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1st Cir. 1973).  In Robinson, the court upheld an award of punitive damages on a seaman's claim for maintenance and cure.  See 477 F.2d at 1051-52.  The court cited Vaughan for the proposition that the "Supreme Court held that a seaman could recover attorneys' fees as damages where a shipowner was callous, willful, or recalcitrant in withholding these [maintenance and cure] payments."  Id. at 1051.  Significantly, however, the court emphasized the language in the Vaughan dissent: "`[I]f the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman, the latter would be entitled to exemplary damages in accord with traditional concepts of the law of damages.'"  Id. (quoting Vaughan, 369 U.S. at 540 (Stewart, J., dissenting)).

---

damages in maintenance and cure cases for guidance in determining whether punitive damages were available in the unseaworthiness context before us.  See Merry Shipping, 650 F.2d at 625 (citing and discussing Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1st Cir. 1973), which allowed punitive damages in a maintenance and cure action).  Thus, if we similarly look to more recent unseaworthiness cases for guidance in determining whether punitive damages are still available in the maintenance and cure context now before us, we find it relevant, though not controlling, to observe that in the wake of Miles, appellate courts have held that punitive damages are now unavailable in unseaworthiness actions under the general maritime law.  See Horsley v. Mobil Oil Corp., 15 F.3d 200, 203 (1st Cir. 1994); Miller, 989 F.2d at 1454-59; Penrod Drilling Corp. v. Williams, 868 S.W.2d 294, 296-97 (Tex. 1993); Sky Cruises, Ltd. v. Andersen, 592 So.2d 756, 756 (Fla. Dist. Ct. App. 1992).

24

To be sure, Pocahontas did uphold an award of punitive damages in a maintenance and cure context, but for at least two reasons, we believe that it is not a particularly strong precedent.  First, the Pocahontas court's emphasis on the Vaughan dissent is troubling, especially because it seems that the court relied on the dissent to reach its conclusion that punitive damages -- in excess of attorney's fees -- may be awarded in maintenance and cure cases. As the Second Circuit noted in Kraljic v. Berman Enterprises, Inc.:

> The [Pocahontas] court justified the punitive damage award primarily by relying on Mr. Justice Stewart's dissenting opinion in [Vaughan v.] Atkinson which, as we have indicated, would have awarded exemplary damages under traditional concepts not necessarily limited to the amount of counsel fees. ***The obvious difficulty with this approach is that the court followed the views of the dissenters in Atkinson and not the majority***.  The court, we believe, correctly perceived that both majority and minority opinions in Atkinson in essence found that punitive damages were awardable in maintenance and cure cases.  ***The inescapable fact is, however, that the majority opinion in Atkinson limited that recovery to counsel fees despite the explicit view of the dissenters that no such curb be imposed***.

575 F.2d 412, 415-16 (2d Cir. 1978) (emphasis added) (citation omitted).

Second, even if we overlook the Pocahontas court's apparent reliance on the Vaughan dissent, the decision was rendered seventeen years before Miles.  In light of Miles, we cannot be sure that the First Circuit would reach the same result today as it did in Pocahontas.  Cf. Horsley v. Mobil Oil Corp., 15 F.3d 200, 203 (1st Cir. 1994) ("Miles mandates the conclusion that punitive damages are not available in an unseaworthiness action under general maritime law.").  In short, Pocahontas was not rock-solid

25

support to begin with, and because of <u>Miles</u>, we believe that its precedential weight has been further eroded.[11]

### 4. The law of other circuits

As mentioned, our court and the First Circuit have upheld punitive damage awards in cases of willful nonpayment of maintenance and cure. In the Second Circuit's <u>Kraljic</u> opinion, the court also found that punitive damages were available in maintenance and cure cases, but the court relied on <u>Vaughan</u> to conclude that any "punitive" recovery is explicitly limited to attorney's fees. See <u>Kraljic</u>, 575 F.2d at 415-16.

---

[11] Guevara contends that the <u>Pocahontas</u> court did not **rely** on the <u>Vaughan</u> dissent. According to Guevara, the <u>Pocahontas</u> court was "mindful that the Supreme Court had not been asked to award punitive damages in <u>Vaughan</u>," and as a consequence, it awarded punitive damages "in accord with traditional concepts of the law of damages." The language of the <u>Vaughan</u> dissent was cited merely as an example of this "traditional concept."

We note, however, that even though admiralty cases have long suggested that punitive damages might be available, <u>see, e.g.</u>, <u>The Amiable Nancy</u>, 16 U.S. (3 Wheat.) 546, 558 (1818) ("[I]f this were a suit against the original wrong-doers, it **might be proper** to go yet farther, and visit [punishment] upon them in the shape of exemplary damages . . . ." (emphasis added)), the Supreme Court has never affirmed an award of punitive damages in an admiralty case. Similarly, before <u>Vaughan</u>, there are very few lower court cases that actually awarded or affirmed an award of punitive damages in a general maritime law context. <u>See</u> <u>Gallagher v. The Yankee</u>, 9 F. Cas. 1091, 1093 (C.C.N.D. Cal. 1859) (No. 5,196) (assessing punitive damages), <u>aff'd</u>, 30 F. Cas. 781 (C.C.N.D. Cal. 1859) (No. 18,124); <u>cf.</u> <u>Petition of Den Norske Amerikalinje A/S</u>, 276 F. Supp. 163, 174, 196-99 (N.D. Ohio 1967) (awarding punitive damages but noting that "punitive damages have never been visited upon a tortfeasor in an admiralty proceeding"), <u>rev'd sub nom.</u> <u>United States Steel Corp. v. Fuhrman</u>, 407 F.2d 1143, 1146-48 (6th Cir. 1969), <u>cert. denied</u>, 398 U.S. 958 (1970).

Moreover, even if we were to accept Guevara's construction of the <u>Pocahontas</u> rationale, we would still be influenced by the maritime developments brought on by <u>Miles</u>.

In *Hines v. J.A. LaPorte, Inc.*, 820 F.2d 1187 (11th Cir. 1987), the Eleventh Circuit squarely confronted the issue of "whether a seaman may be awarded punitive damages in addition to reasonable attorney's fees for the arbitrary and willful withholding of maintenance and cure benefits." *Id.* at 1188. The court recognized that punitive damages in excess of attorney's fees were available in the First Circuit and in the Fifth Circuit, while the Second Circuit limited the award to attorney's fees. The court chose to rely on our *Merry Shipping* opinion, noting that "[f]ollowing the guidance of *Merry Shipping* . . . it seems clear that even if exemplary in nature, attorney's fees, if fixed reasonably to cover only a proper fee award, would not foreclose the punitive purpose of a punitive damage award." *Id.* at 1189. Thus, the *Hines* court held that "both reasonable attorney's fees and punitive damages may be legally awarded in a proper case." *Id.* Of course, *Hines*'s reliance on *Merry Shipping* is now analytically problematic because, as explained, *Merry Shipping* was effectively overruled by the later decision in *Miles*. Similarly, in *Manuel v. United States*, 50 F.3d 1253 (4th Cir. 1995), the Fourth Circuit in dicta noted that "[c]ourts have long awarded punitive damages to seamen where maintenance and cure benefits have been arbitrarily and willfully denied." *Id.* at 1260. The court cited *Holmes* and *Pocahontas* for this proposition, however, and there was no mention of *Miles*.

The law in the Sixth Circuit is unclear. Dicta in *Al-Zawkari v. American Steamship Co.*, 871 F.2d 585, 590 n.8 (6th Cir. 1989),

27

implies that punitive damages could be available, but the decision was pre-<u>Miles</u> and it cited <u>Holmes</u> as support. The district courts in the Sixth Circuit have also come to different conclusions. <u>Compare</u> <u>Hoeffling v. United States Steel</u>, 792 F. Supp. 1029, 1030 (E.D. Mich. 1991) ("[A] claim for punitive damages under the doctrine of maintenance and cure is recognizable in this circuit.") <u>with</u> <u>Owens v. Conticarriers & Terminals, Inc.</u>, 591 F. Supp. 777, 792 (W.D. Tenn. 1984) (holding that "because defendant's refusal to pay maintenance and cure was callous and willful, plaintiff is entitled to an award of punitive damages **limited to attorney's fees**") <u>and</u> <u>In re Mardoc Asbestos Case Clusters</u>, 768 F. Supp. 595, 599-600 & n.1 (E.D. Mich. 1991) (suggesting that punitive damages are not recoverable at all in the general maritime law). As mentioned, it is worth noting that the Sixth Circuit in <u>Miller</u> concluded that <u>Miles</u> precluded the recovery of punitive damages in general maritime unseaworthiness actions.

Finally, a recent Ninth Circuit opinion explicitly addressed the post-<u>Miles</u> propriety of a punitive damages award for the failure to pay maintenance and cure. In <u>Glynn v. Roy Al Boat Management Corp.</u>, Nos. 93-15546, 93-15681, 1995 WL 366967 (9th Cir. June 21, 1995), the Ninth Circuit stated that "[b]ecause <u>Miles</u> did not consider the availability of punitive damages, and was not faced with a claim for maintenance and cure that has no statutory analog, it does not directly control the question of whether punitive damages are available for the willful failure to pay maintenance." <u>Id.</u> at *7. Instead, the court looked to <u>Vaughan</u> for

28

guidance, and it determined that "we see no support for punitive damages in addition to attorney's fees in Vaughan itself . . . . We see no other reason why punitive damages, in addition to attorney's fees, should be allowed." Id. at *8. As the court concluded, "[w]e therefore hold that punitive damages are not available, although attorney's fees are, where the shipowner has been willful and persistent in its failure to investigate a seaman's claim for maintenance and cure or to pay maintenance." Id. at *9.

To sum up, the cases that Holmes relied upon cannot now support the result in Holmes. Vaughan awarded attorney's fees, and not punitive damages; Merry Shipping did not involve maintenance and cure, and it has been overruled by Miles; and Pocahontas is questionable in light of its pre-Miles analysis and its apparent reliance upon the Vaughan dissent.[12] We turn now to the independent impact of the Miles decision on the availability of punitive damages in cases of willful nonpayment of maintenance and cure.

**C. The Effect of Miles on Maintenance and Cure Actions**

Maritime argues that Guevara's recovery of punitive damages in his maintenance and cure action is barred by the dictates of Miles. Maritime's argument, of course, cannot rest on the specific holdings of Miles, as Miles did not involve a maintenance and cure

---

[12] Of the federal appellate cases that Holmes does not cite, Glynn precluded the recovery of punitive damages, Kraljic limited punitive damages to the amount of attorney's fees, and Hines relied on the now-overruled Merry Shipping. The other circuit law is dicta at best, and the cases relied upon our Holmes decision.

29

claim. The logic and analytical framework of <u>Miles</u>, however, are clearly relevant, and they do support Maritime's argument.

Based on our interpretation of <u>Miles</u>, it should be clear that with maintenance and cure actions, we simply need to ask if "the factual setting of the case" or the "situation" is one covered by a statute like the Jones Act or DOHSA.[13] Seizing on this framework, some courts have already determined that a maintenance and cure action is not covered by statute, and as such, this general maritime action is not subject to the <u>Miles</u> uniformity principle. <u>See, e.g.</u>, <u>Anderson</u>, 797 F. Supp. at 536 ("[P]unitive damages for willful failure to pay maintenance and cure, a firmly rooted general maritime law claim, is unaffected by <u>Miles</u> because failure to pay is a contractual claim not reached by any maritime statute. Such claims do not implicate negligence or strict liability values."); <u>Breshears v. River Marine Contractors, Inc.</u>, Civ. A. No. 92-1850, 1992 WL 245656, at *2 (E.D. La. Sept. 10, 1992) ("Actions for the failure to pay maintenance and [c]ure are grounded in the

_____

[13]     It is for this reason that Guevara's appeal to the double wage penalty provision of 46 U.S.C. § 10313 (formerly 46 U.S.C. § 596) is unavailing, as this statute does not cover maintenance and cure actions. <u>See</u> <u>Clinton v. Joshua Hendy Corp.</u>, 277 F.2d 447, 447-48 (9th Cir. 1960) (per curiam) (holding that maintenance payments are not "wages" and are therefore not subject to the double penalty provision of § 596); <u>Ladzinski v. Sperling S.S. & Trading Corp.</u>, 300 F. Supp. 947, 958 (S.D.N.Y. 1969) ("It has been held that the shipowner's duty of prompt payment of `wages' under [§] 596 does not apply to the unearned wages due to the seaman injured in the service of the vessel . . . or to the maintenance and cure benefits owed to the same seaman.") (collecting cases). Similarly, analogies to the Longshore and Harbor Workers' Compensation Act ("LHWCA") are not particularly relevant, as the LHWCA does not cover plaintiff seamen (like Guevara) or maintenance and cure actions.

general maritime law and have no counterpart in the tort provisions of DOHSA and the Jones Act. . . . The principles of uniformity found in <u>Miles</u> . . . are, therefore, inapposite to the determination of whether punitive damages are available for a failure to pay maintenance and cure."); <u>Howard v. Atlantic Pacific Marine Corp.</u>, Civ. A. No. 89-3073, 1992 WL 55487, at *2 (E.D. La. Feb. 28, 1992) ("[U]nlike unseaworthiness and negligence claims, maintenance and cure claims have no counterpart under the Jones Act or the DOHSA."); <u>Ridenour v. Holland America Line Westours, Inc.</u>, 806 F. Supp. 910, 911 (W.D. Wash. 1992) ("The <u>Miles</u> Court, however, did not address maintenance and cure, which is an area of law in which Congress has not legislated against punitive damages. Thus this Court concludes that <u>Miles</u> is not dispositive on this point.").

The analysis, however, is somewhat more complicated. A careful examination of the maintenance and cure action belies the contention that it has no analog in the existing statutory schemes. In <u>Cortes</u>, Justice Cardozo was faced with the question of "whether death resulting from the ***negligent omission to furnish care or cure*** is death from ***personal injury*** within the meaning of the [Jones Act] statute." 287 U.S. at 372 (emphasis added). Initially, Justice Cardozo recognized the peculiar nature of the shipowner's duty to provide maintenance and cure:

> The duty to make such [maintenance and cure] provision is imposed by the law itself as one annexed to the employment. Contractual it is in the sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident.

31

. . .
      The duty . . . is one annexed by law to a relation, and
      annexed as an inseparable incident without heed to any
      expression of the will of the contracting parties. ***For
      breach of a duty thus imposed, the remedy upon the
      contract does not exclude an alternative remedy built
      upon the tort***.

Id. at 371-72 (emphasis added) (citation omitted); see also id.

("If the wrong is of such a nature as to bring it by fair

intendment within the category of a `personal injury' that has been

caused by the `negligence' of the master, it is not put beyond the

[Jones Act] because it may appropriately be placed in another

category also."). Thus, as the Supreme Court explained by way of

example:

      The failure to provide maintenance and cure may be a
      personal injury or something else according to the
      consequences. If the seaman has been able to procure his
      maintenance and cure out of his own or his friends'
      money, his remedy is for the outlay, ***but personal injury
      there is none***. If the default of the vessel and its
      officers has impaired his bodily or mental health, ***the
      damage to mind or body is none the less a personal injury
      because he may be free at his election to plead it in a
      different count***.

Id. at 373-74 (emphasis added). The Court therefore concluded:

      While the seaman was still alive, his cause of action for
      personal injury created by the statute may have
      overlapped his cause of action for breach of the maritime
      duty of maintenance and cure, just as it may have
      overlapped his cause of action for injury caused through
      an unseaworthy ship. In such circumstances, it was his
      privilege, in so far as the causes of action covered the
      same ground, to sue indifferently on any one of them.

Id. at 374-75; see also Picou v. American Offshore Fleet, Inc., 576

F.2d 585, 587 (5th Cir. 1978) (citing and discussing Cortes after

noting that "[t]he defendant takes the position that since a

[personal injury] recovery could be available to [the plaintiff] in

32

a simple action for maintenance and cure, he could not allege a tort claim comprehending the same elements of injury . . . . This is simply not the law."); Gilmore & Black, supra, § 6-13, at 311 ("Such [personal injury] damages may be recovered either in an action for maintenance and cure or in an action for negligence under the Jones Act.") (citing Cortes).

Thus, as the Supreme Court has indicated, there are really two "types" of maintenance and cure actions. The tort-like type involves a personal injury; i.e., typically a worsening of the seaman's physical or mental health caused by the failure to provide maintenance or, more likely, cure. The contract-like type need not involve a personal injury (although it may); it need only involve the loss of a monetary outlay. Because the tort-like maintenance and cure action involves a personal injury, however, it overlaps with the personal injury coverage of the Jones Act.[14] Such an action is frequently brought under the Jones Act. See, e.g., Picou, 576 F.2d at 586-87; Gaspard v. Taylor Diving & Salvage Co.,

---

[14] Indeed, in 1982, Congress amended the Jones Act by adding § 688(b):

> No action may be maintained under subsection (a) of this section [the original Jones Act] or under any other maritime law of the United States **for maintenance and cure** or for damages for the injury or death of a person who was not a citizen or permanent resident alien of the United States at the time of the incident giving rise to the action . . . .

46 U.S.C. § 688(b) (emphasis added). It is noteworthy that this denial of maintenance and cure to a class of seamen was added **under the Jones Act**, as it indicates a congressional recognition that maintenance and cure actions are related to the Jones Act scheme.

33

649 F.2d 372, 376 (5th Cir. 1981), cert. denied, 455 U.S. 907 (1982). As mentioned, once there is a statutory/general maritime law overlap in the factual circumstances that are covered, the Miles damages uniformity principle is invoked, and punitive damages would be precluded under the general maritime action for maintenance and cure.[15]

Guevara seems to assert that our characterization of a Jones Act "overlap" is not accurate for maintenance and cure actions that give rise to punitive awards because "[i]t is the willful conduct of the vessel owner not negligence of the Captain or crew which gives rise to [an] award of punitive damages for failure to pay maintenance and cure." This argument, however, is misconceived, as the willful refusal to pay maintenance and cure is not a cause of action separate from the negligent failure to pay maintenance and cure. As the Fourth Circuit explained in Manuel:

> [T]he . . . court went astray by treating the **arbitrary and willful** refusal to pay maintenance and cure as a cause of action separate from the **simple** failure to pay maintenance and cure benefits when due. There is no cause of action specifically for the arbitrary and willful refusal to pay maintenance and cure. Under general maritime law, a seaman injured while employed aboard a ship is entitled to receive maintenance and cure, and he can bring an admiralty suit to recover any unpaid maintenance and cure benefits. Courts have long

---

[15]    Guevara tries to circumvent the Miles uniformity principle by arguing that "Congress did not create the right to maintenance and cure nor . . . did Congress create the right to sue a vessel owner for failure to provide maintenance and cure to its injured seaman." We note, however, that Congress neither created the warranty of seaworthiness nor fashioned the general maritime unseaworthiness action; nevertheless, this did not prevent the Supreme Court from concluding that the unseaworthiness action is subject to the Miles uniformity principle.

> awarded punitive damages to seamen where maintenance and cure benefits have been arbitrarily and willfully denied. <u>E.g.</u>, <u>Holmes v. J. Ray McDermott & Co.</u>, 734 F.2d 1110, 1118 (5th Cir. 1984); <u>Robinson v. Pocahontas, Inc.</u>, 477 F.2d 1048, 1051-52 (1st Cir. 1973). Punitive damages, however, is merely an additional remedy in the seaman's maintenance and cure action.

50 F.3d at 1259-60. Thus, the denial of maintenance and cure benefits gives rise to only one cause of action -- failure to pay maintenance and cure -- and this one action is cognizable under both the Jones Act and the general maritime law, although the action under the Jones Act for the failure to pay maintenance and cure requires a personal injury as well. If willful conduct is demonstrated, it raises the possibility of a punitive award, but the cause of action for failure to pay maintenance and cure does not require or depend upon proof of willfulness.

Based on this rationale, it should be clear that proving even a willful denial of maintenance and cure cannot justify an award of punitive damages after <u>Miles</u>. Under <u>Cortes</u>, a tort-like action for the failure to pay maintenance and cure is cognizable under the Jones Act, but ***even if willful behavior is established***, the Jones Act does not provide for punitive damages. Under the <u>Miles</u> uniformity principle, therefore, the same cause of action under the general maritime law for the failure to pay maintenance and cure cannot provide a punitive recovery, even if willfulness is demonstrated.

Of course, our analysis is not yet complete, because in the instant case, Guevara brings a ***contract-like*** maintenance and cure action. Guevara suffered no personal injury from the failure to

35

provide maintenance and cure, and therefore, there is no statutory overlap to invoke the Miles uniformity principle.  In such a case, the general maritime law is not directly constrained by statute.  Nevertheless, for several reasons, we believe that punitive damages should not be available in *any* action for maintenance and cure, even in those contract-like actions that can only be brought under the general maritime law.

First, even admitting that the primary reason for allowing punitive damages is to deter wrongful conduct on the part of a potential wrongdoer -- here, the shipowner -- it seems peculiar to deny punitive damages to a seaman who suffers personal injury because of a willful failure to pay maintenance and cure, but to allow the possibility of a punitive recovery for a seaman who suffers only a monetary loss.

Second, Guevara is asking us to affirm a punitive damages award that is *not* available under related legislative schemes.  As the Supreme Court stated in American Dredging Co. v. Miller, 114 S. Ct. 981, 989 (1994), "[w]hile there is an established and continuing tradition of federal common lawmaking in admiralty, that law is to be developed, insofar as possible, to harmonize with the enactments of Congress in the field."  In the context before us, therefore, American Dredging counsels us to err on the side of "harmonization" with the legislative schemes, and that nudge towards harmony weighs in favor of prohibiting punitive damages in maintenance and cure cases, at least where, as here, a clear legal basis for the award of such damages is lacking.

36

Third, a concern for uniformity *within* federal admiralty law affects our decision. It makes little sense to create a fragmentation of admiralty law by allowing punitive damages in one class of maintenance and cure cases (contract-like), yet disallowing punitive damages in the other class of maintenance and cure cases (tort-like).

Fourth, when no element of personal injury is involved, these contract-like maintenance and cure actions are just that -- primarily contract-oriented claims. Punitive damages, however, are generally unavailable for breach of contract, and to the limited extent that the obligation to pay maintenance and cure is contractual in nature, allowing punitive damages for a breach thereof is anomalous. See, e.g., Restatement (Second) of Contracts § 355, at 154-56 (1979); 11 Samuel Williston, A Treatise on the Law of Contracts § 1340, at 209-12 (3d ed. 1968); 5 Arthur Linton Corbin, Corbin on Contracts § 1077, at 437-39 (1964).[16]

### III. CONCLUSION

Our Holmes precedent for the availability of punitive damages in maintenance and cure cases is no longer well-founded. In particular, the advent of Miles brings about significant changes in the admiralty that we cannot ignore. We conclude that Vaughan and

---

[16] We do not address Maritime's procedural due process concerns as they were not raised in the district court or in the initial appeal. See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir.) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (emphasis omitted)), cert. denied, 115 S. Ct. 189 (1994); Quenzer v. United States (In re Quenzer), 19 F.3d 163, 165 (5th Cir. 1993) ("Typically, we will not consider on appeal matters not presented to the trial court.").

_Miles_ still permit the recovery of attorney's fees in maintenance and cure cases as long as the proper showing of egregious fault is made. See, e.g., _Morales_, 829 F.2d at 1358. However, when we couple the weakened foundation of _Holmes_ with our understanding of the _Miles_ uniformity principle, we are persuaded that punitive damages should no longer be available in cases of willful nonpayment of maintenance and cure under the general maritime law. To this extent, therefore, _Holmes_ is overruled. The district court's judgment is REVERSED insofar as it awarded punitive damages to Guevara for the willful failure to pay maintenance, but in all other respects, the judgment of the district court is AFFIRMED. Costs shall be borne by Maritime.