(Slip Opinion) OCTOBER TERM, 2008 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ATLANTIC SOUNDING CO., INC., ET AL. *v.* TOWNSEND

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 08–214. Argued March 2, 2009—Decided June 25, 2009

Atlantic Sounding Co. allegedly refused to pay maintenance and cure to respondent Townsend for injuries he suffered while working on its tugboat, and then filed this declaratory relief action regarding its obligations. Townsend filed suit under the Jones Act and general maritime law, alleging, *inter alia,* arbitrary and willful failure to provide maintenance and cure. He filed similar counterclaims in the declaratory judgment action, seeking punitive damages for the maintenance and cure claim. The District Court denied petitioners' motion to dismiss the punitive damages claim, but certified the question for interlocutory appeal. Following its precedent, the Eleventh Circuit held that punitive damages may be awarded for the willful withholding of maintenance and cure.

*Held:* Because punitive damages have long been an accepted remedy under general maritime law, and because neither *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, nor the Jones Act altered this understanding, punitive damages for the willful and wanton disregard of the maintenance and cure obligation remain available as a matter of general maritime law. Pp. 2–19.

(a) Settled legal principles establish three points central to this case. Pp. 2–9.

(i) Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct. English law during the colonial era accorded juries the authority to award such damages when warranted. And American courts have likewise permitted such damages since at least 1784. This Court has also found punitive damages authorized as a matter of common-law doctrine. See, *e.g., Day* v. *Woodworth*, 13 How. 363. Pp. 3–5.

(ii) The common-law punitive damages tradition extends to claims arising under federal maritime law. See *Lake Shore & Michigan Southern R. Co.* v. *Prentice*, 147 U. S. 101, 108. One of this Court's first cases so indicating involved an action for marine trespass. See *The Amiable Nancy*, 3 Wheat. 546. And lower federal courts have found punitive damages available in maritime actions for particularly egregious tortious acts. Pp. 5–6.

(iii) Nothing in maritime law undermines this general rule's applicability in the maintenance and cure context. The maintenance and cure obligation dates back centuries as an aspect of general maritime law, and the failure of a seaman's employers to provide adequate medical care was the basis for awarding punitive damages in cases decided in the 1800's. This Court has since registered its agreement with such decisions and has subsequently found that in addition to wages, "maintenance" includes food and lodging at the ship's expense, and "cure" refers to medical treatment, *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 441. Moreover, an owner's failure to provide proper medical care for seamen has provided lower courts the impetus to award damages that appear to contain at least some punitive element. Pp. 7–8.

(iv) Under these settled legal principles, respondent is entitled to pursue punitive damages unless Congress has enacted legislation that departs from the common-law understanding. P. 9.

(b) The plain language of the Jones Act does not provide a basis for overturning the common-law rule. Congress enacted the Jones Act to overrule *The Osceola*, 189 U. S. 158, where the Court prohibited a seaman or his family from recovering for injuries or death suffered due to his employers' negligence. To that end, the Act created a statutory negligence cause of action, but it did not eliminate preexisting remedies available to seamen for the separate common-law cause of action based on maintenance and cure. The Act bestows the right to "elect" to bring a Jones Act claim, thereby indicating a choice of actions for seamen—not an exclusive remedy. Because the then-accepted remedies arose from general maritime law, it necessarily follows that Congress envisioned their continued availability. See *Chandris, Inc.* v. *Latsis*, 515 U. S. 347, 354. Had the Jones Act been the only remaining remedy available, there would have been no election to make. And, the only statutory restrictions on general maritime maintenance and cure claims were enacted long after the Jones Act's passage and limit availability for only two discrete classes: foreign workers on offshore oil and mineral production facilities and sailing school students and instructors. This indicates that "Congress knows how to" restrict the traditional maintenance and cure remedy "when it wants to." *Omni Capital Int'l, Ltd.* v. *Rudolf*

*Wolff & Co.*, 484 U. S. 97, 106. This Court has consistently observed that the Jones Act preserves common-law causes of action such as maintenance and cure, see. *e.g., The Arizona* v. *Anelich*, 298 U. S. 110, and its case law supports the view that punitive damages awards, in particular, continue to remain available in maintenance and cure actions, see *Vaughan* v. *Atkinson*, 369 U. S. 527. Pp. 9–13.

(i) Contrary to petitioners' argument, *Miles* does not limit recovery to the remedies available under the Jones Act. *Miles* does not address either maintenance and cure actions in general or the availability of punitive damages for such actions. Instead, it grappled with the entirely different question whether general maritime law should provide a cause of action for wrongful death based on unseaworthiness. The Court found that the Jones Act and the Death on the High Seas Act (DOHSA), along with state statutes, supported recognition of a general maritime rule for wrongful death of a seaman. However, since Congress had chosen to limit the damages available in the Jones Act and DOHSA, excluding damages for loss of society or lost future earnings, 498 U. S., at 21, 31–32, its judgment must control the availability of remedies for wrongful-death actions brought under general maritime law, *id.*, at 32–36. *Miles'* reasoning does not apply here. Unlike Miles' situation*,* both the general maritime cause of action here (maintenance and cure) and the remedy (punitive damages) were well established before the Jones Act's passage. And unlike *Miles'* facts, the Jones Act does not address the general maritime cause of action here or its remedy. It is thus possible to adhere to the traditional understanding of maritime actions and remedies without abridging or violating the Jones Act; unlike wrongful-death actions, this traditional understanding is not a matter to which "Congress has spoken directly." See *id.,* at 31. Moreover, petitioners' contrary view was directly rejected in *Norfolk Shipbuilding & Drydock Corp.* v. *Garris*, 532 U. S. 811, 820. If *Miles* presented no barrier to the *Garris* Court's endorsement of a previously unrecognized maritime cause of action for negligent wrongful death, there is no legitimate basis for a contrary conclusion here. Like negligence, the duty of maintenance and cure and the general availability of punitive damages have been recognized "for more than a century," 532 U. S., at 820. And because respondent does not ask this Court to alter statutory text or "expand" the maritime tort law's general principles, *Miles* does not require eliminating the general maritime remedy of punitive damages for the willful or wanton failure to comply with the duty to pay maintenance and cure. The fact that seamen commonly seek to recover under the Jones Act for maintenance and cure claims, does not mean that the Jones Act provides the only remedy. See *Cortes* v. *Baltimore Insular Line, Inc.*, 287 U. S.

Syllabus

367, 374–375. The laudable quest for uniformity in admiralty does not require narrowing available damages to the lowest common denominator approved by Congress for distinct causes of action. Pp. 13–19.

496 F. 3d 1282, affirmed and remanded.

THOMAS, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–214

## ATLANTIC SOUNDING CO., INC., ET AL., PETITIONERS *v.* EDGAR L. TOWNSEND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 25, 2009]

JUSTICE THOMAS delivered the opinion of the Court.

The question presented by this case is whether an injured seaman may recover punitive damages for his employer's willful failure to pay maintenance and cure. Petitioners argue that under *Miles* v. *Apex Marine Corp.*, 498 U. S. 19 (1990), seamen may recover only those damages available under the Jones Act, 46 U. S. C. §30104. We disagree. Historically, punitive damages have been available and awarded in general maritime actions, including some in maintenance and cure. We find that nothing in *Miles* or the Jones Act eliminates that availability.

I

Respondent Edgar L. Townsend was a crew member of the Motor Tug Thomas. After falling on the steel deck of the tugboat and injuring his arm and shoulder, respondent claimed that petitioner Atlantic Sounding,[1] the owner of the tugboat, advised him that it would not provide main-

---

[1] Atlantic Sounding Co., Inc., is a wholly owned subsidiary of Weeks Marine, Inc., the other petitioner in this case.

tenance and cure. See 496 F. 3d 1282, 1283 (CA11 2007). "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 441 (2001).

Petitioners thereafter filed an action for declaratory relief regarding their obligations with respect to maintenance and cure. Respondent filed his own suit under the Jones Act and general maritime law, alleging negligence, unseaworthiness, arbitrary and willful failure to pay maintenance and cure, and wrongful termination. In addition, respondent filed similar counterclaims in the declaratory judgment action, seeking punitive damages for the denial of maintenance and cure. The District Court consolidated the cases. See 496 F. 3d, at 1283–1284.

Petitioners moved to dismiss respondent's punitive damages claim. The District Court denied the motion, holding that it was bound by the determination in *Hines* v. *J. A. LaPorte, Inc.*, 820 F. 2d 1187, 1189 (CA11 1987) *(per curiam)*, that punitive damages were available in an action for maintenance and cure. The court, however, agreed to certify the question for interlocutory appeal. See 496 F. 3d, at 1284. The United States Court of Appeals for the Eleventh Circuit agreed with the District Court that *Hines* controlled and held that respondent could pursue his punitive damages claim for the willful withholding of maintenance and cure. 496 F. 3d, at 1285–1286. The decision conflicted with those of other Courts of Appeals, see, *e.g.*, *Guevara* v. *Maritime Overseas Corp.*, 59 F. 3d 1496 (CA5 1995) (en banc); *Glynn* v. *Roy Al Boat Management Corp.*, 57 F. 3d 1495 (CA9 1995), and we granted certiorari, 555 U. S. ___ (2008).

## II

Respondent claims that he is entitled to seek punitive

damages as a result of petitioners' alleged breach of their "maintenance and cure" duty under general maritime law. We find no legal obstacle to his doing so.

## A

Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct. Under English law during the colonial era, juries were accorded broad discretion to award damages as they saw fit. See, *e.g.*, *Lord Townsend* v. *Hughes,* 2 Mod. 150, 86 Eng. Rep. 994 (C. P. 1676) ("[I]n *civil actions* the plaintiff is to recover by way of compensation for the damages he hath sustained, and the jury are the proper judges thereof" (emphasis in original)); 1 T. Sedgwick, Measure of Damages §349, p. 688 (9th ed. 1912) (hereinafter Sedgwick) ("Until comparatively recent times juries were as arbitrary judges of the amount of damages as of the facts"). The common-law view "was that 'in cases where the amount of damages was uncertain[,] their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.'" *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 353 (1998) (quoting *Dimick* v. *Schiedt*, 293 U. S. 474, 480 (1935); alteration in original).

The jury's broad discretion to set damages included the authority to award punitive damages when the circumstances of the case warranted. Just before the ratification of the Constitution, Lord Chief Justice Pratt explained that "a jury ha[s] it in [its] power to give damages for more than the injury received. Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself." *Wilkes* v. *Wood*, Lofft 1, 18–19, 98 Eng. Rep. 489, 498–499 (C. P. 1763); see also *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 25 (1991) (SCALIA,

J., concurring in judgment) ("[P]unitive or 'exemplary' damages have long been a part of Anglo-American law"); *Huckle* v. *Money*, 2 Wils. 205, 207, 95 Eng. Rep. 768, 769 (C. P. 1763) (declining to grant a new trial because the jury "ha[s] done right in giving exemplary damages").

American courts have likewise permitted punitive damages awards in appropriate cases since at least 1784. See, *e.g.*, *Genay* v. *Norris*, 1 S. C. L. 6, 7 (C. P. and Gen. Sess. 1784) (approving award of "very exemplary damages" because spiking wine represented a "very wanton outrage"); *Coryell* v. *Colbaugh*, 1 N. J. L. 77 (1791) (concluding that a breach of promise of marriage was "of the most atrocious and dishonourable nature" and supported "damages for *example's* sake, to prevent such offences in future" (emphasis in original)). Although some States elected not to allow juries to make such awards, the vast majority permitted them. See 1 Sedgwick §§352, 354, at 694, 700. By the middle of the 19th century, "punitive damages were undoubtedly an established part of the American common law of torts [and] no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount." *Haslip, supra,* at 26–27 (SCALIA, J., concurring in judgment).

This Court has also found the award of punitive damages to be authorized as a matter of common-law doctrine. In *Day* v. *Woodworth*, 13 How. 363 (1852), for example, the Court recognized the "well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant . . . ." *Id.,* at 371; see also *Philadelphia, W., & B. R. Co.* v. *Quigley*, 21 How. 202, 214 (1859) ("Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved per-

son"); *Barry* v. *Edmunds*, 116 U. S. 550, 562 (1886) ("[A]ccording to the settled law of this court, [a plaintiff] might show himself, by proof of the circumstances, to be entitled to exemplary damages calculated to vindicate his right and protect it against future similar invasions").

### B

The general rule that punitive damages were available at common law extended to claims arising under federal maritime law. See *Lake Shore & Michigan Southern R. Co.* v. *Prentice*, 147 U. S. 101, 108 (1893) ("[C]ourts of admiralty . . . proceed, in cases of tort, upon the same principles as courts of common law, in allowing exemplary damages . . ."). One of this Court's first cases indicating that punitive damages were available involved an action for marine trespass. See *The Amiable Nancy*, 3 Wheat. 546 (1818). In the course of deciding whether to uphold the jury's award, Justice Story, writing for the Court, recognized that punitive damages are an available maritime remedy under the proper circumstances. Although the Court found that the particular facts of the case did not warrant such an award against the named defendants, it explained that "if this were a suit against the original wrong-doers, it might be proper to . . . visit upon them in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct." *Id.*, at 558; see also *Barry*, *supra,* at 563 ("In *The Amiable Nancy*, which was the case of a marine tort, Mr. Justice Story spoke of exemplary damages as 'the proper punishment which belongs to . . . lawless misconduct'" (citation omitted)).

The lower federal courts followed suit, finding that punitive damages were available in maritime actions for tortious acts of a particularly egregious nature. See, *e.g.*, *McGuire* v. *The Golden Gate*, 16 F. Cas. 141, 143 (No. 8,815) (CC ND Cal. 1856) ("In an action against the perpe-

trator of the wrong, the aggrieved party would be entitled to recover not only actual damages but exemplary,—such as would vindicate his wrongs, and teach the tort feasor the necessity of reform"); *Ralston* v. *The State Rights*, 20 F. Cas. 201, 210 (No. 11,540) (DC ED Pa. 1836) ("[I]t is not legally correct . . . to say that a court cannot give exemplary damages, in a case like the present, against the owners of a vessel"); *Boston Mfg. Co.* v. *Fiske*, 3 F. Cas. 957 (No. 1,681) (CC Mass. 1820) (Story, J.) ("In cases of marine torts, or illegal captures, it is far from being uncommon in the admiralty to allow costs and expences, and to mulct the offending parties, even in exemplary damages, where the nature of the case requires it"). In short, prior to enactment of the Jones Act in 1920, "maritime jurisprudence was replete with judicial statements approving punitive damages, especially on behalf of passengers and seamen." Robertson, Punitive Damages in American Maritime Law, 28 J. Mar. L. & Comm. 73, 115 (1997) (hereinafter Robertson); see also 2 Sedgwick §599b, at 1156 ("Exemplary damages are awarded in Admiralty, as in other jurisdictions"); 2 J. Sutherland, Law of Damages §392, p. 1272 (4th ed. 1916) ("As a rule a court of equity will not award [punitive] damages, but courts of admiralty will . . ." (footnote omitted)).[2]

---

[2] Although punitive damages awards were rarely upheld on judicial review, but see *Roza* v. *Smith*, 65 F. 592, 596–597 (DC ND Cal. 1895); *Gallagher* v. *The Yankee*, 9 F. Cas. 1091, 1093 (No. 5,196) (DC ND Cal. 1859), that fact does not draw into question the basic understanding that punitive damages were considered an available maritime remedy. Indeed, in several cases in which a judgment awarding punitive damage awards was overturned on appeal, the reversal was based on unrelated grounds. See, *e.g.*, *The Margharita*, 140 F. 820, 824 (CA5 1905); *Pacific Packing & Nav. Co.* v. *Fielding*, 136 F. 577, 580 (CA9 1905); *Latchtimacker* v. *Jacksonville Towing & Wrecking Co.*, 181 F. 276, 278 (CC SD Fla. 1910).

C

Nothing in maritime law undermines the applicability of this general rule in the maintenance and cure context. See G. Gilmore & C. Black, Law of Admiralty §6–13, p. 312 (2d ed. 1975) (hereinafter Gilmore & Black) (explaining that a seaman denied maintenance and cure "has a free option to claim damages (including punitive damages) under a general maritime law count"); Robertson 163 (concluding that breach of maintenance and cure is one of the particular torts for which general maritime law would most likely permit the awarding of punitive damages "assuming . . . the requisite level of blameworthiness"). Indeed, the legal obligation to provide maintenance and cure dates back centuries as an aspect of general maritime law, and the failure of a seaman's employers to provide him with adequate medical care was the basis for awarding punitive damages in cases decided as early as the 1800's.

The right to receive maintenance and cure was first recognized in this country in two lower court decisions authored by Justice Story. See *Harden* v. *Gordon*, 11 F. Cas. 480 (No. 6,047) (CC Me. 1823); *Reed* v. *Canfield*, 20 F. Cas. 426 (No. 11,641) (CC Mass. 1832). According to Justice Story, this common-law obligation to seamen was justified on humanitarian and economic grounds: "If some provision be not made for [seamen] in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. . . . [T]he merchant himself derives an ultimate benefit [because i]t encourages seamen to engage in perilous voyages with more promptitude, and at lower wages." *Harden*, *supra,* at 483; see also *Reed*, *supra,* at 429 ("The seaman is to be cured at the expense of the ship, of the sickness or injury sustained in the ship's service").

This Court has since registered its agreement with these

decisions. "Upon a full review . . . of English and American authorities," the Court concluded that "the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued." *The Osceola*, 189 U. S. 158, 175 (1903). Decisions following *The Osceola* have explained that in addition to wages, "maintenance" includes food and lodging at the expense of their ship, and "cure" refers to medical treatment. *Lewis*, 531 U. S., at 441; see also Gilmore & Black §6–12, at 267–268 (describing "maintenance and cure" as including medical expenses, a living allowance, and unearned wages).

In addition, the failure of a vessel owner to provide proper medical care for seamen has provided the impetus for damages awards that appear to contain at least some punitive element. For example, in *The City of Carlisle*, 39 F. 807 (DC Ore. 1889), the court added $1,000 to its damages award to compensate an apprentice seaman for "gross neglect and cruel maltreatment of the [seaman] since his injury." *Id.,* at 809, 817. The court reviewed the indignities to which the apprentice had been subjected as he recovered without any serious medical attention, see *id.*, at 810–812, and explained that "if owners do not wish to be mulct in damages for such misconduct, they should be careful to select men worthy to command their vessels and fit to be trusted with the safety and welfare of their crews, and particularly apprentice boys." *Id.,* at 817; see also *The Troop*, 118 F. 769, 770–771, 773 (DC Wash. 1902) (explaining that $4,000 was a reasonable award because the captain's "failure to observe the dictates of humanity" and obtain prompt medical care for an injured seaman constituted a "monstrous wrong").[3]

--------

[3] Although these cases do not refer to "punitive" or "exemplary" damages, scholars have characterized the awards authorized by these

## D

The settled legal principles discussed above establish three points central to resolving this case. First, punitive damages have long been available at common law. Second, the common-law tradition of punitive damages extends to maritime claims.[4] And third, there is no evidence that claims for maintenance and cure were excluded from this general admiralty rule. Instead, the pre-Jones Act evidence indicates that punitive damages remain available for such claims under the appropriate factual circumstances. As a result, respondent is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common-law understanding. As explained below, it has not.

## III

## A

The only statute that could serve as a basis for overturning the common-law rule in this case is the Jones Act. Congress enacted the Jones Act primarily to overrule *The Osceola, supra,* in which this Court prohibited a seaman or his family from recovering for injuries or death suffered

———————

decisions as such. See Robertson 103–105; Edelman, *Guevara v. Maritime Overseas Corp.:* Opposing the Decision, 20 Tulane Mar. L. J. 349, 351, and n. 22 (1996).

[4] The dissent correctly notes that the handful of early cases involving maintenance and cure, by themselves, do not definitively resolve the question of punitive damages availability in such cases. See *post,* at 6–8 (opinion of ALITO, J.). However, it neglects to acknowledge that the general common-law rule made punitive damages available in maritime actions. See *supra,* at 5–6. Nor does the dissent explain why maintenance and cure actions should be excepted from this general rule. It is because of this rule, and the fact that these early cases support—rather than refute—its application to maintenance and cure actions, see *supra,* at 7–8, that the pre-Jones Act evidence supports the conclusion that punitive damages were available at common law where the denial of maintenance and cure involved wanton, willful, or outrageous conduct.

due to his employers' negligence. To this end, the statute provides in relevant part:

> "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section." 46 U. S. C. §30104(a) (incorporating the Federal Employers' Liability Act, 45 U. S. C. §§51–60).

The Jones Act thus created a statutory cause of action for negligence, but it did not eliminate pre-existing remedies available to seamen for the separate common-law cause of action based on a seaman's right to maintenance and cure. Section 30104 bestows upon the injured seaman the right to "elect" to bring a Jones Act claim, thereby indicating a choice of actions for seamen—not an exclusive remedy. See Funk & Wagnalls New Standard Dictionary of the English Language 798 (1913) (defining "elect" as "[t]o make choice of"); 1 Bouvier's Law Dictionary 979 (8th ed. 1914) (defining "election" as "[c]hoice; selection"). Because the then-accepted remedies for injured seamen arose from general maritime law, see *The Osceola*, *supra,* at 175, it necessarily follows that Congress was envisioning the continued availability of those common-law causes of action. See *Chandris, Inc.* v. *Latsis*, 515 U. S. 347, 354 (1995) ("Congress enacted the Jones Act in 1920 to remove the bar to suit for negligence articulated in *The Osceola*, thereby completing the trilogy of heightened legal protections [including maintenance and cure] that seamen receive because of their exposure to the perils of the sea" (internal quotation marks omitted)); *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 487 (2005) (describing the Jones Act as "remov[ing] this bar to negligence suits by

seamen"). If the Jones Act had been the only remaining remedy available to injured seamen, there would have been no election to make.

In addition, the only statutory restrictions expressly addressing general maritime claims for maintenance and cure were enacted long after the passage of the Jones Act. They limit its availability for two discrete classes of people: foreign workers on offshore oil and mineral production facilities, see §503(a)(2), 96 Stat. 1955, codified at 46 U. S. C. §30105(b), and sailing school students and instructors, §204, 96 Stat. 1589, codified at 46 U. S. C. §50504(b). These provisions indicate that "Congress knows how to" restrict the traditional remedy of maintenance and cure "when it wants to." *Omni Capital Int'l, Ltd.* v. *Rudolf Wolff & Co.*, 484 U. S. 97, 106 (1987). Thus, nothing in the statutory scheme for maritime recovery restricts the availability of punitive damages for maintenance and cure for those, like respondent, who are not precluded from asserting the general maritime claim.

Further supporting this interpretation of the Jones Act, this Court has consistently recognized that the Act "was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty. Its purpose was to enlarge that protection, not to narrow it." *The Arizona* v. *Anelich*, 298 U. S. 110, 123 (1936); see also *American Export Lines, Inc.* v. *Alvez*, 446 U. S. 274, 282 (1980) (plurality opinion) (declining to "read the Jones Act as sweeping aside general maritime law remedies"); *O'Donnell* v. *Great Lakes Dredge & Dock Co.*, 318 U. S. 36, 43 (1943) ("It follows that the Jones Act, in extending a right of recovery to the seaman injured while in the service of his vessel by negligence, has done no more than supplement the remedy of maintenance and cure . . ."); *Pacific S. S. Co.* v. *Peterson*, 278 U. S. 130, 134, 138–139 (1928) (holding that the Jones Act "was not intended to restrict in any way the long-established right of a seaman to maintenance,

cure and wages").

Not only have our decisions repeatedly observed that the Jones Act preserves common-law causes of action such as maintenance and cure, but our case law also supports the view that punitive damages awards, in particular, remain available in maintenance and cure actions after the Act's passage. In *Vaughan* v. *Atkinson*, 369 U. S. 527 (1962), for example, the Court permitted the recovery of attorney's fees for the "callous" and "willful and persistent" refusal to pay maintenance and cure. *Id.*, at 529–531. In fact, even the *Vaughan* dissenters, who believed that such fees were generally unavailable, agreed that a seaman "would be entitled to exemplary damages in accord with traditional concepts of the law of damages" where a "shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman." *Id.*, at 540 (opinion of Stewart, J.); see also *Fiske*, 3 F. Cas., at 957 (Story, J.) (arguing that counsel fees are awardable in "[c]ourts of admiralty . . . not technically as costs, but upon the same principles, as they are often allowed damages in cases of torts, by courts of common law, as a recompense for injuries sustained, as exemplary damages, or as a remuneration for expences incurred, or losses sustained, by the misconduct of the other party").[5]

Nothing in the text of the Jones Act or this Court's decisions issued in the wake of its enactment undermines

―――――――――

[5] In the wake of *Vaughan*, a number of lower courts expressly held that punitive damages can be recovered for the denial of maintenance and cure. See, *e.g.*, *Hines* v. *J. A. Laporte, Inc.*, 820 F. 2d 1187, 1189 (CA11 1987) *(per curiam)* (upholding punitive damages award of $5,000 for an "arbitrary and bad faith breach of the duty to furnish maintenance and cure"); *Robinson* v. *Pocahontas, Inc.*, 477 F. 2d 1048, 1049–1052 (CA1 1973) (affirming punitive damages award of $10,000 which was based, in part, on the defendant's initial withholding of maintenance and cure on the pretext that the seaman had been fired for cause).

the continued existence of the common-law cause of action providing recovery for the delayed or improper provision of maintenance and cure. Petitioners do not deny the availability of punitive damages in general maritime law, or identify any cases establishing that such damages were historically unavailable for breach of the duty of maintenance and cure. The plain language of the Jones Act, then, does not provide the punitive damages bar that petitioners seek.

## B

Petitioners nonetheless argue that the availability of punitive damages in this case is controlled by the Jones Act because of this Court's decision in *Miles,* 498 U. S. 19; see also *post*, at 5–6 (opinion of ALITO, J.). In *Miles*, petitioners argue, the Court limited recovery in maritime cases involving death or personal injury to the remedies available under the Jones Act and the Death on the High Seas Act (DOHSA), 46 U. S. C. §§30301–30306.[6] Petitioners' reading of *Miles* is far too broad.

*Miles* does not address either maintenance and cure actions in general or the availability of punitive damages for such actions. The decision instead grapples with the entirely different question whether general maritime law should provide a cause of action for wrongful death based on unseaworthiness. By providing a remedy for wrongful death suffered on the high seas or in territorial waters, the Jones Act and DOHSA displaced a general maritime rule that denied any recovery for wrongful death. See *Miles*, 498 U. S., at 23–34. This Court, therefore, was called upon in *Miles* to decide whether these new statutes supported an expansion of the relief available under pre-

_____

[6] DOHSA applies only to individuals killed (not merely injured) by conduct on the high seas. See 46 U. S. C. §30302. Because this case involves injuries to a seaman, and not death on the high seas, DOHSA is not relevant.

existing general maritime law to harmonize it with a
cause of action created by statute.

The Court in *Miles* first concluded that the "unanimous
legislative judgment behind the Jones Act, DOHSA, and
the many state statutes" authorizing maritime wrongful-
death actions, supported the recognition of a general
maritime action for wrongful death of a seaman. *Id.,* at 24
(discussing *Moragne* v. *States Marine Lines, Inc.*, 398 U. S.
375 (1970), which overruled *The Harrisburg*, 119 U. S. 199
(1886)). Congress had chosen to limit, however, the dam-
ages available for wrongful-death actions under the Jones
Act and DOHSA, such that damages were not statutorily
available for loss of society or lost future earnings. See
*Miles,* 498 U. S., at 21, 31–32. The Court thus concluded
that Congress' judgment must control the availability of
remedies for wrongful-death actions brought under gen-
eral maritime law, *id.*, at 32–36.

The reasoning of *Miles* remains sound. As the Court in
that case explained, "[w]e no longer live in an era when
seamen and their loved ones must look primarily to the
courts as a source of substantive legal protection from
injury and death; Congress and the States have legislated
extensively in these areas." *Id.*, at 27. Furthermore, it
was only because of congressional action that a general
federal cause of action for wrongful death on the high seas
and in territorial waters even existed; until then, there
was no general common-law doctrine providing for such an
action. As a result, to determine the remedies available
under the common-law wrongful-death action, "an admi-
ralty court should look primarily to these legislative en-
actments for policy guidance." *Ibid*. It would have been
illegitimate to create common-law remedies that exceeded
those remedies statutorily available under the Jones Act
and DOHSA. See *id.*, at 36 ("We will not create, under our
admiralty powers, a remedy . . . that goes well beyond the
limits of Congress' ordered system of recovery for seamen's

injury and death").

But application of that principle here does not lead to the outcome suggested by petitioners or the dissent. See *post*, at 2–3. Unlike the situation presented in *Miles*, both the general maritime cause of action (maintenance and cure) and the remedy (punitive damages) were well established before the passage of the Jones Act. See *supra,* at 3–8. Also unlike the facts presented by *Miles*, the Jones Act does not address maintenance and cure or its remedy.[7] It is therefore possible to adhere to the traditional understanding of maritime actions and remedies without abridging or violating the Jones Act; unlike wrongful-death actions, this traditional understanding is not a matter to which "Congress has spoken directly." See *Miles*, *supra,* at 31 (citing *Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618, 625 (1978)). Indeed, the *Miles* Court itself acknowledged that "[t]he Jones Act evinces no general hostility to recovery under maritime law," 498 U. S., at 29, and noted that statutory remedy limitations "would not necessarily deter us, if recovery . . . were more consistent with the general principles of maritime tort law." *Id.*, at 35. The availability of punitive damages for maintenance and cure actions is entirely faithful to these "general principles of maritime tort law," and no statute casts doubt on their availability under general maritime law.

Moreover, petitioners' contention that *Miles* precludes *any* action or remedy for personal injury beyond that made available under the Jones Act was directly rejected by this Court in *Norfolk Shipbuilding & Drydock Corp.* v. *Garris*, 532 U. S. 811, 818 (2001). That case involved the death of

——————

[7]Respondent's claim is not affected by the statutory amendments to the Jones Act that limit maintenance and cure recovery in cases involving foreign workers on offshore oil and mineral production facilities, see 46 U. S. C. §30105, or sailing school students and instructors, §50504. See *supra*, at 11.

a harbor worker. *Ibid.* There, the Court recognized a maritime cause of action for wrongful death attributable to negligence although neither the Jones Act (which applies only to seamen) nor DOHSA (which does not cover territorial waters) provided such a remedy. *Id.*, at 817–818. The Court acknowledged that "it will be the better course, in many cases that assert new claims beyond what those statutes have seen fit to allow, to leave further development to Congress." *Id.,* at 820. But the Court concluded that the cause of action at issue there was "new only in the most technical sense" because "[t]he general maritime law has recognized the tort of negligence for more than a century, and it has been clear since *Moragne* that breaches of a maritime duty are actionable when they cause death, as when they cause injury." *Ibid.* The Court thus found that "Congress's occupation of this field is not yet so extensive as to preclude us from recognizing what is already logically compelled by our precedents." *Ibid.*

Because *Miles* presented no barrier to this endorsement of a previously unrecognized maritime cause of action for negligent wrongful death, we see no legitimate basis for a contrary conclusion in the present case. Like negligence, "[t]he general maritime law has recognized . . . for more than a century" the duty of maintenance and cure and the general availability of punitive damages. See *Garris, supra,* at 820; see also *supra*, at 3–8. And because respondent does not ask this Court to alter statutory text or "expand" the general principles of maritime tort law, *Miles* does not require us to eliminate the general maritime remedy of punitive damages for the willful or wanton failure to comply with the duty to pay maintenance and cure. "We assume that Congress is aware of existing law when it passes legislation," *Miles*, *supra,* at 32, and the available history suggests that punitive damages were an established part of the maritime law in 1920, see *supra*, at

5–8.[8]

It remains true, of course, that "[a]dmiralty is not created in a vacuum; legislation has always served as an important source of both common law and admiralty principles." *Miles, supra,* at 24. And it also is true that the negligent denial of maintenance and cure may also be the subject of a Jones Act claim. See *Cortes* v. *Baltimore Insular Line, Inc.*, 287 U. S. 367 (1932).[9] But the fact that seamen commonly seek to recover under the Jones Act for the wrongful withholding of maintenance and cure does not mean that the Jones Act provides the only remedy for maintenance and cure claims. Indeed, contrary to petitioners' view that the Jones Act replaced in their entirety the remedies available at common law for maintenance and cure, the *Cortes* decision explicitly acknowledged a seaman's right to choose among overlapping statutory and common-law remedies for injuries sustained by the denial of maintenance and cure. See 287 U. S., at 374–375 (A seaman's "cause of action for personal injury created by the statute may have overlapped his cause of action for breach of the maritime duty of maintenance and cure . . . . In such circumstances it was his privilege, in so far as the causes of action covered the same ground, to sue indiffer-

_____

[8] In light of the Court's decision in *Norfolk Shipbuilding & Drydock Corp.* v. *Garris*, 532 U. S. 811, 818 (2001), our reading of *Miles* cannot, as the dissent contends, represent an "abrup[t]" change of course. See *post*, at 1.

[9] For those maintenance and cure claims that do not involve personal injury (and thus cannot be asserted under the Jones Act), the dissent argues that punitive damages should be barred because such claims are based in contract, not tort. See *post*, at 8. But the right of maintenance and cure "was firmly established in the maritime law long before recognition of the distinction between tort and contract." *O'Donnell* v. *Great Lakes Dredge & Dock Co.*, 318 U. S. 36, 42 (1943). Although the right has been described as incident to contract, it cannot be modified or waived. See *Cortes* v. *Baltimore Insular Line, Inc.*, 287 U. S. 367, 372 (1932).

ently on any one of them").[10]

As this Court has repeatedly explained, "remedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures." *Fitzgerald* v. *United States Lines Co.*, 374 U. S. 16, 18 (1963); see also *Peterson*, 278 U. S., at 138, 139 (emphasizing that a seaman's action for maintenance and cure is "independent" and "cumulative" from other claims such as negligence and that the maintenance and cure right is "in no sense inconsistent with, or an alternative of, the right to recover compensatory damages [under the Jones Act]"). See also Gilmore & Black §6–23, at 342 ("It is unquestioned law that both the Jones Act and the unseaworthiness remedies are additional to maintenance and cure: the seaman may have maintenance and cure and also one of the other two"). The laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lowest common denominator approved by Congress for distinct causes of action.[11] Although "Con-

_____

[10] The fact that, in some cases, a violation of the duty of maintenance and cure may also give rise to a Jones Act claim, see *post*, at 3 (opinion of ALITO, J.), is significant only in that it requires admiralty courts to ensure against double recovery. See *Fitzgerald* v. *United States Lines Co.*, 374 U. S. 16, 18–19 (1963) (authorizing a jury trial when a maintenance and cure claim is joined with a Jones Act claim because, "[r]equiring a seaman to split up his lawsuit, submitting part of it to a jury and part to a judge . . . can easily result in too much or too little recovery"). Thus, a court may take steps to ensure that any award of damages for lost wages in a Jones Act negligence claim is offset by the amount of lost wages awarded as part of a recovery of maintenance and cure. See, *e.g.*, *Petition of Oskar Tiedemann & Co.*, 367 F. 2d 498, 505, n. 6 (CA3 1966); *Crooks* v. *United States*, 459 F. 2d 631, 633 (CA9 1972).

[11] Although this Court has recognized that it may change maritime law in its operation as an admiralty court, see *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 271 (1979), petitioners have not asked the Court to do so in this case or pointed to any serious

gress . . . is free to say this much and no more," *Miles*, 498
U. S., at 24 (internal quotation marks omitted), we will
not attribute words to Congress that it has not written.

## IV

Because punitive damages have long been an accepted
remedy under general maritime law, and because nothing
in the Jones Act altered this understanding, such damages
for the willful and wanton disregard of the maintenance
and cure obligation should remain available in the appro-
priate case as a matter of general maritime law.[12] Limit-
ing recovery for maintenance and cure to whatever is
permitted by the Jones Act would give greater pre-emptive
effect to the Act than is required by its text, *Miles*, or any
of this Court's other decisions interpreting the statute.
For these reasons, we affirm the judgment of the Court of
Appeals and remand the case for further proceedings
consistent with this opinion.

*It is so ordered.*

_____

anomalies, with respect to the Jones Act or otherwise, that our holding
may create. Nor have petitioners argued that the size of punitive
damages awards in maintenance and cure cases necessitates a recovery
cap, which the Court has elsewhere imposed. See *Exxon Shipping Co.*
v. *Baker*, 554 U. S. ___, ___ (2008) (slip op., at 42) (imposing a punitive-
to-compensatory ratio of 1:1). We do not decide these issues.

[12] Because we hold that *Miles* does not render the Jones Act's dam-
ages provision determinative of respondent's remedies, we do not
address the dissent's argument that the Jones Act, by incorporating the
provisions of the Federal Employers' Liability Act, see 46 U. S. C.
§30104(a), prohibits the recovery of punitive damages in actions under
that statute. See *post*, at 3–5.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–214

_____

## ATLANTIC SOUNDING CO., INC., ET AL., PETITIONERS *v.* EDGAR L. TOWNSEND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 25, 2009]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

In *Miles* v. *Apex Marine Corp.*, 498 U. S. 19 (1990), this Court provided a workable framework for analyzing the relief available on claims under general maritime law. Today, the Court abruptly changes course. I would apply the analytical framework adopted in *Miles*, and I therefore respectfully dissent.

I

In order to understand our decision in *Miles*, it is necessary to appreciate the nature of the authority that the *Miles* Court was exercising. The Constitution, by extending the judicial power of the United States to admiralty and maritime cases, impliedly empowered this Court to continue the development of maritime law "in the manner of a common law court." *Exxon Shipping Co.* v. *Baker*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 16); see also *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 360–361 (1959). In *Miles*, this Court explained how that authority should be exercised in an era in which statutory law has become dominant.

*Miles* presented two questions regarding the scope of relief permitted under general maritime law, the first of which was whether damages for loss of society may be recovered on a general maritime law wrongful-death claim. In order to answer this question, the Court looked to the Death on the High Seas Act, 46 U. S. C. §30301 *et seq.,* and the Jones Act 46 U. S. C. §30101 *et seq.,* both of which created new statutory wrongful-death claims. Because the relief available on these statutory claims does not include damages for loss of society, the Court concluded that it should not permit such damages on a wrongful-death claim brought under general maritime law. The Court explained:

> "We no longer live in an era when seamen and their loved ones must look primarily to the courts as a source of substantive legal protection from injury and death; Congress and the States have legislated extensively in these areas. *In this era, an admiralty court should look primarily to these legislative enactments for policy guidance.*" 498 U. S., at 27 (emphasis added).

The Court took a similar approach in answering the second question in *Miles*—whether damages for loss of future income should be available in a general maritime law survival action. The Court noted that "[t]here are indeed strong policy arguments for allowing such recovery" and that "admiralty courts have always shown a special solicitude for the welfare of seamen and their families." *Id.*, at 35–36. But because the Jones Act survival provision "limits recovery to losses suffered during the decedent's lifetime," the Court held that a similar limitation should apply under general maritime law. *Id.,* at 36.

*Miles* thus instructs that, in exercising our authority to develop general maritime law, we should be guided pri-

marily by the policy choices reflected in statutes creating closely related claims. Endorsing what has been termed a principle of uniformity, *Miles* teaches that if a form of relief is not available on a statutory claim, we should be reluctant to permit such relief on a similar claim brought under general maritime law.

## II
## A

The type of maintenance and cure claim that is most likely to include a request for punitive damages is a claim that a seaman suffered personal injury as a result of the willful refusal to provide maintenance and cure. Such a claim may be brought under general maritime law. See *Cortes* v. *Baltimore Insular Line, Inc.*, 287 U. S. 367, 374 (1932) (recognizing that a seaman may sue under general maritime law to recover for personal injury resulting from the denial of maintenance and cure). And a similar claim may also be maintained under the Jones Act. See, *e.g.*, *Guevara* v. *Maritime Overseas Corp.*, 59 F. 3d 1496, 1499–1500 (CA5 1995) (en banc); G. Gilmore & C. Black, Law of Admiralty §6–13, p. 311 (2d ed. 1975). To be sure, a seaman asserting a Jones Act claim must show that his employer was negligent, *ibid.*, while a seaman proceeding under general maritime law may recover compensatory damages without establishing fault, *id.,* at 310. But because the prevailing rule in American courts does not permit punitive damages without a showing of fault, see *Exxon Shipping*, *supra,* at 16, n. 2, it appears that any personal injury maintenance and cure claim in which punitive damages might be awarded could be brought equally under either general maritime law or the Jones Act. The *Miles* uniformity therefore weighs strongly in favor of a rule that applies uniformly under general maritime law and the Jones Act. I therefore turn to the question whether punitive damages may be awarded under the

Jones Act.

B

Enacted in 1920, the Jones Act, 46 U. S. C. §§30104–30105(b), makes applicable to seamen the substantive recovery provisions of the Federal Employers Liability Act (FELA), 45 U. S. C. §51 *et seq.,* which became law in 1908. FELA, in turn, "recites only that employers shall be liable in 'damages' for the injury or death of one protected under the Act." *Miles, supra,* at 32 (citing 45 U. S. C. §51).

Prior to the enactment of the Jones Act, however, this Court had decided several cases that explored the damages allowed under FELA. In *Michigan Central R. Co.* v. *Vreeland*, 227 U. S. 59 (1913), the Court dealt primarily with the damages that may be recovered under FELA's wrongful-death provision, but the Court also discussed the damages available in the case of injury. The Court noted that if the worker in that case had not died from his injuries, "he might have recovered such damages as would have compensated him for his expense, loss of time, suffering and diminished earning power." *Id.*, at 65. Two years later, in *St. Louis, I. M. & S. R. Co.* v. *Craft*, 237 U. S. 648 (1915), the Court reiterated that an injured worker may recover only compensatory damages. Addressing the damages available to a party bringing a survival claim, the Court explained that the party may recover only those damages that had accrued to the worker at the time of his death and was thus limited to "such damages as will be reasonably compensatory for the loss and suffering of the injured person while he lived." *Id.*, at 658. See also *ibid.* (damages "confined to the [the worker's] personal loss and suffering before he died"); *Miller* v. *American President Lines, Ltd.*, 989 F. 2d 1450, 1457 (CA6), cert. denied, 510 U. S. 915 (1993) ("It has been the unanimous judgment of the courts since before the enactment of the Jones Act that punitive damages are not recoverable under [FELA])."

When Congress incorporated FELA unaltered into the Jones Act, Congress must have intended to incorporate FELA's limitation on damages as well. *Miles,* 498 U. S., at 32. "We assume that Congress is aware of existing law when it passes legislation." *Ibid.* (citing *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979)). It is therefore reasonable to assume that only compensatory damages may be recovered under the Jones Act. See *Pacific S. S. Co.* v. *Peterson*, 278 U. S. 130, 136–.139 (1928) (under the Jones Act, a seaman may "recover compensatory damages for injuries caused by the negligence"). And under *Miles*' reasoning—at least in the absence of some exceptionally strong countervailing considerations— the rule should be the same when a seaman sues under general maritime law for personal injury resulting from the denial of maintenance and cure.

### III

In reaching the opposite conclusion, the Court reasons that: punitive damages were available on maintenance and cure claims prior to the enactment of the Jones Act and that the Jones Act was not intended to trim the relief available on such general maritime law claims. This reasoning is flawed.

### A

First, the Court proceeds as if the question here were whether the Jones Act was meant to preclude general maritime law claims and remedies. See *ante*, at 9–10 (Jones Act does not "overtur[n]" or "eliminate pre-existing remedies available to seamen"); *ante*, at 11 (Jones Act "preserves common-law causes of action"); *ante*, at 15 (*Miles* does not "preclud[e]" all claims and remedies beyond that made available under the Jones Act). *Miles* explicitly rejected that argument. See 498 U. S., at 29. But just because the Jones Act was not meant to preclude

general maritime claims or remedies, it does not follow that the Jones Act was meant to stop the development of general maritime law by the courts. The Jones Act is significant because it created a statutory claim that is indistinguishable for present purposes from a general maritime law maintenance and cure claim based on personal injury and because this statutory claim does not permit the recovery of punitive damages. "Congress, in the exercise of its legislative powers, is free to say 'this much and no more,'" and "an admiralty court should look primarily to these legislative enactments for policy guidance." *Miles*, *supra,* at 24, 27. This policy embodied in the Jones Act thus constitutes a powerful argument in favor of the development of a similar rule under general maritime law.

### B

That brings me to the Court's claim that the availability of punitive damages was established before the Jones Act was passed. If punitive damages were a widely recognized and regularly employed feature of maintenance and cure claims during the pre-Jones Act era, I would not rule out the possibility that this history might be sufficient to outweigh the *Miles* uniformity principle. But a search for cases in which punitive damages were awarded for the willful denial of maintenance of cure—in an era when seamen were often treated with shocking callousness— yields very little. Although American courts have entertained maintenance and cure suits since the early 19th century, the Court points to only two reported cases—*The City of Carlisle*, 39 F. 807 (DC Ore. 1889), and *The Troop*, 118 F. 769 (DC Wash. 1902)—that, as the Court carefully puts it, "appear to contain at least some punitive element." *Ante*, at 8.

The Court's choice of words is well advised, for it is not even clear that punitive damages were recovered in these

two obscure cases. In *The City of Carlisle,* a 16-year-old apprentice suffered a fractured skull. The captain refused to put ashore. Given little care, the apprentice spent the next six or seven weeks in his bunk, wracked with pain, and was then compelled to work 12 hours a day for the remaining three months of the voyage. Upon landing, the captain made no arrangements for care and did not pay for the apprentice's brain surgery. The apprentice received an award of $1,000; that may include some "punitive element," but it seems likely that much if not all of that sum represented compensation for the apprentice's months of agony and the lingering effects of his injury.

The Court's second case, *The Troop*, *supra*, involved similarly brutal treatment. The seaman fell from a mast and fractured an arm and a leg while his ship was six miles from its port of departure. Refusing to return to port, the captain subjected the seaman to maltreatment for the remainder of the 36-day voyage. As a result, he was required to undergo painful surgery, and his injuries permanently prevented him from returning to work as a mariner. He received an undifferentiated award of $4,000, and while the court was sharply critical of the captain's conduct, it is far from clear that the award did not consist entirely of compensatory damages for medical expenses, lost future income, and pain and suffering.

In addition to the two cases cited by the Court, respondent and an *amicus* claim that punitive damages were awarded in a few additional cases. See Brief for Respondent 13; Brief for *Amicus Curiae* American Assn. of Justice as *Amicus Curiae* 10–11. Of these cases, *The Margharita,* 140 F. 820 (CA5 1905), is perhaps the most supportive. There, the court explained that its award of $1,500 would not only "compensate the seaman for his unnecessary and unmerited suffering" but would "emphasize the importance of humane and correct judgment under the circumstances on the part of the master." *Id.,* at

827. While the court's reference to the message that the award embodied suggests that the award was in part punitive, it is also possible that the reference simply represented a restatement of one of the traditional rationales for maintenance and cure, *i.e.,* that it served the economic interests of shipowners and the general interests of the country by making service as a seaman more attractive. See *Harden* v. *Gordon,* 11 F. Cas. 480, 485 (No. 6,047) (CC Me. 1823).

The remaining cases contain harsh criticism of the seamen's treatment but do not identify any portion of the award as punitive. See *The Rolph*, 293 F. 269 (ND Cal. 1923), aff'd, 299 F. 52 (CA9 1924) (undifferentiated award of $10,000 for a seaman rendered blind in both eyes); *Tomlinson* v. *Hewett*, 24 F. Cas. 29, 32 (No. 14,087) (DC Cal. 1872).

In sum, the search for maintenance and cure cases in which punitive damages were awarded yields strikingly slim results. The cases found are insufficient in number, clarity, and prominence to justify departure from the *Miles* uniformity principle.

IV

There is one remaining question in this case, namely, whether punitive damages are permitted when a seaman asserts a general maritime law maintenance and cure claim that is not based on personal injury. In *Cortes,* 287 U. S., at 371, the Court explained that the duty to furnish maintenance and cure "is one annexed to the employment. . . . Contractual it is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident." The duty is thus essentially quasicontractual, and therefore, in those instances in which the seaman does not suffer personal injury, recovery should be governed by the law of quasi-contract. See Restatement (Second) of Con-

tracts §§4b, 12f (1979); Restatement of Restitution §§113–114 (1936); 1 D. Dobbs, Law of Remedies §4.2(3), pp 580 (2d ed. 1993).  Thus, an award of punitive damages is not appropriate.  See also *Guevara*, 59 F. 3d, at 1513.

\*    \*    \*

For these reasons, I would hold that punitive damages are not available in a case such as this, and I would therefore reverse the decision of the Court of Appeals.